Argued and submitted August 27, 2008, affirmed February 11, 2009

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## BOBBY LEE GUGGENMOS,
*Defendant-Appellant.*

Klamath County Circuit Court
0500398CR; A133266

202 P3d 892

Robin A. Jones, Senior Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Brewer, Presiding Judge, and Schuman, Judge, and Riggs, Senior Judge.

SCHUMAN, J.

## SCHUMAN, J.

■　　Defendant was convicted of possession of a controlled substance. On appeal, he assigns error to the trial court's denial of his motion to suppress evidence found in the room where he was living at a friend's house. According to defendant, police violated his rights under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution by unlawfully stopping him as he was leaving the house and by conducting a "protective sweep" of the residence without a warrant. We review the trial court's legal conclusions for errors of law, accepting the facts on which those legal conclusions are based if they are supported by any evidence. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We affirm.

The following account is taken from the trial court's findings of fact and the undisputed testimony at the hearing on defendant's motion to suppress. Corporal Deese of the Klamath Falls Police Department contacted an Oregon State Police Trooper, Officer Mogle, with information that a particular vehicle that Deese recognized as being "associated with narcotics" was parked in an alley behind a house in Klamath Falls. Mogle recognized the location; an informant had previously told Mogle that narcotics activity and the harboring of certain "wanted" people occurred there. The two officers arranged to go to the house to conduct a so-called "knock-and-talk," that is, a conversation with the house's occupant during which the police will remain on the threshold unless they receive permission to enter. While Deese went to the alley behind the house to make sure nobody left by way of a back door, Mogle and another officer, Morrison, knocked on the front door. An unidentified woman answered and allowed them to come in.

Once inside, the officers encountered a man named Tidwell.[1] Mogle told Tidwell that he was looking for "wanted" persons who, he believed, were staying in the house. Tidwell responded that the only people in the house were himself, his

---

[1] The motion to suppress hearing was held in two sessions. At the first, Deese testified in detail about the encounter; in that version, he and Mogle both knocked at the front door and were invited in by Tidwell. At the second session, held around two months later, he related events in a narrative that matched Mogle's.

girlfriend, and a friend named Sam. Mogle then asked if he could look through the house, and Tidwell gave his consent. As they walked through the kitchen and into a hall, they approached a stairway leading down to the back door. Mogle saw two men, later identified as defendant and Sam, running down the stairs. Mogle demanded that they stop, but, after a brief hesitation, they continued, only to be confronted, when they opened the back door, by Deese. When Deese ordered them to stop, they did so.

Mogle asked Deese to run a warrant check on defendant and Sam and then went back into the house, where he began to look into rooms for other, potentially dangerous, persons—a so-called "protective sweep." On the second floor, he entered a bedroom and saw, in plain view, a mirror with white powder on it. He recognized the substance as a narcotic, and later field testing confirmed that it was methamphetamine.

Mogle came downstairs and was told by Tidwell that the room in which he had found the methamphetamine was defendant's. Mogle then went outside, where he learned from Deese that there was an outstanding warrant for the arrest of defendant. Mogle told defendant that he had found methamphetamine in his room and asked for consent to conduct a further search. Defendant said he could "go ahead." The subsequent search did not lead to any additional evidence.

Defendant moved for suppression of the methamphetamine and all statements he made regarding it. He argued that Mogle and Deese unlawfully stopped him as he was leaving the house, because, at the time, they did not have reasonable suspicion of criminal activity. He further argued that, even if the stop was lawful, the subsequent warrantless entry into his room during the protective sweep was not. Nor, he contends, was the second entrance lawful; although he consented, that consent derived from information obtained during the first, unlawful, entry, during which Mogle had first seen the contraband. The court denied the motion. Defendant then entered a conditional plea of guilty, reserving his right to appeal the denial of his motion. ORS 135.335(3). This appeal, in which he renews the arguments he made below, ensued.

We begin with the stop.[2] The state concedes that, when the officers ordered defendant to stop, they effected a seizure of his person for purposes of Article I, section 9. We agree. A person who is twice ordered to halt by a uniformed police officer, and two others in plain clothes, has doubtless experienced a limitation on his freedom of movement. *See State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991) (defining seizure). The issue is whether the stop was lawful. The state argues that it was justified because the officers reasonably suspected that defendant was engaging in, or had engaged in, criminal activity. Whether a suspicion is reasonable depends on the particular circumstances of the case and whether the police can point to specific and articulable facts that give rise to a reasonable inference that a person has committed, or is about to commit, a crime. *Ehly*, 317 Or at 80. Defendant argues that the fact that he and his companion were fleeing does not by itself support a reasonable suspicion of criminal activity. We agree. *State v. Puffenbarger*, 166 Or App 426, 435, 998 P2d 788 (2000). Furthermore, neither vague information about "wanted people" who might be in a particular house, nor prior experience indicating that one of the occupants might at some time have engaged in narcotics activities, would, by itself, create reasonable suspicion. However, the totality of the circumstances in this case includes not only flight, information from an informant about harboring people with warrants, and knowledge of earlier narcotics activity; it also includes the fact that Tidwell misinformed Mogle about the presence of a fourth adult on the premises. All of those facts, combined, created reasonable suspicion. For that reason, the stop was lawful.

Defendant argues that, regardless of the legality of the seizure of his person, the evidence was discovered only after Mogle had reentered the house and conducted a warrantless search of his room that was not justified by any exception to the warrant requirement. The state offers two responses: first, it argues that Mogle had consent to enter the room, and second, it argues that the search was a lawful "protective sweep."

---

[2] Defendant does not argue that the officers' original entry into the house was unlawful, and we therefore do not address that question.

█ The only consent to search the residence that Mogle received was from Tidwell, who told him that he could look through the house to see if any wanted persons were there. A third party can consent to the search of another person's property if the consenting person and the other person have common use, access, or control of the premises to be searched. *State v. Carsey*, 295 Or 32, 38-46, 664 P2d 1085 (1983). However, the shared use, access, or control must be actual, not merely apparent, and the burden of proving that fact is on the state. *State v. Surface/Hurley*, 183 Or App 368, 372, 51 P3d 713 (2002). Here, the only evidence in the record is that Tidwell did *not* share use, access, or control of defendant's room; he informed Mogle that defendant's room was upstairs, while his own rooms—which he expressly gave Mogle permission to search—were downstairs. Nor is there any evidence of a familial or other relationship between Tidwell and defendant from which we might infer common use, access, or control. Thus, the state failed to establish that Mogle had valid consent to enter defendant's room.

In the alternative, the state argues that Mogle's search of the residence was a lawful "protective sweep" of the premises. The term "protective sweep" derives from a United States Supreme Court case, *Maryland v. Buie*, 494 US 325, 327, 110 S Ct 1093, 108 L Ed 2d 276 (1990). In that case, the Court held that, incident to a lawful arrest, police may conduct a "quick and limited search of premises * * * narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* Because the contours of a valid search incident to arrest under Article I, section 9, of the Oregon Constitution differ from, and are narrower than, what is permitted under the Fourth Amendment, the Oregon Supreme Court apparently has declined to follow *Buie*. *State v. Cocke*, 334 Or 1, 8-10, 45 P3d 109 (2002). The Oregon Supreme Court did, however, recognize that, under the "officer safety" exception to the warrant requirement as articulated in *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987), an officer who has reasonable suspicion of an immediate, serious threat to himself or others, based on specific and articulable facts (as opposed to mere generalized concern) can, in some circumstances, conduct the same kind of search that the United States Supreme Court approved in *Buie*.

*Cocke*, 334 Or at 9. This court recognized the "protective sweep" aspect of the "officer safety" exception in *State v. Bentz*, 211 Or App 129, 135-37, 158 P3d 1081 (2007).

However, in both *Cocke* and *Bentz*, the respective courts held that the circumstances did not justify such a search. In *Cocke*, the police conducted the search based on the discovery of marijuana in a common area of the apartment building, concerns that more marijuana might be present and that other individuals might be present in multiple apartments in the building, and a month-old report concerning the use of a laser sight from an apartment window. In rejecting the state's argument that the search was a lawful protective sweep, the court held that the facts created only a "generalized concern that was based on stale information and that focused neither on defendant nor on his apartment," and did "not approach the kind of immediacy that this court stated in *Bates* would be necessary to make a 'protective' search reasonable. We cannot justify a constitutional intrusion that is far more significant than the one in *Bates* on facts that are far less compelling." *Cocke*, 334 Or at 9-10 (citation omitted). We reached a similar conclusion in *Bentz*, 211 Or App at 137, where the only justification for conducting a protective search was an officer's knowledge, based on his training, that, because he had discovered a gun on one of a house's occupants, other occupants likely had guns as well.

■ In this case, Mogle's reentry into the house to conduct the sweep was based on the following circumstances: He had a recent report that two named, wanted persons who were believed to be involved with narcotics might be in the residence, which, he suspected, was itself the site of narcotics activity. One occupant of the residence had lied to him about how many people were there. That occupant remained in the house with another police officer. Two other occupants had attempted to flee.

These facts differ in few but significant respects from the facts in *Cocke* and *Bentz*. Here, the reports concerned the harboring of wanted persons in a single residence and recent drug activity, unlike the search of a separate apartment and a month-old report of the use of a laser sight in *Cocke*. The persons whom Mogle feared might still be in the residence

were not unnamed phantoms; Mogle knew their names, knew they were involved with drugs, and knew that they had frequented the house. Those facts alone, however, would not justify the protective sweep. *Cocke* and *Bentz*, as well as *Bates*, require more: they require specific and articulable facts that would lead a reasonable police officer to believe that there was *immediate* danger to himself or others. In *Cocke*, awareness of drug activity and the possible presence of unapprehended individuals not only failed to justify the search; those circumstances "[did] not *approach* the kind of immediacy" that would have justified it. 334 Or at 9 (emphasis added). In *Bentz*, we found that even a prudently held fear of danger did not justify a protective search. 211 Or App at 137. We presume that, for purposes of a protective search, danger is not immediate if it can be confronted and defused by securing the premises and obtaining a warrant. Mogle was outside the house when he decided to reenter to conduct a sweep. He was not in immediate danger.

However, securing the premises and obtaining a warrant was not a reasonable option in this situation because the third officer, Morrison, remained inside the house with Tidwell. Mogle explained that he "went back upstairs to clear the upstairs because my other officer was up there by himself." Thus, Mogle had to reenter the house and check the upstairs rooms—without delay—in order to prevent what he reasonably (but, in the event, wrongly) perceived as an immediate threat to Morrison from named persons whom he knew to be wanted individuals involved with drugs. An officer safety sweep is justified not only by immediate danger to the officer, but to others as well. *Bates*, 304 Or at 524. Perhaps Mogle could have reentered, explained the situation to Morrison, accompanied Morrison and Tidwell outside, and then attempted to obtain a warrant. His decision to sweep the house himself, however, was the sort of judgment that we are reluctant "to uncharitably second-guess." *Id.* We therefore conclude that Mogle's reentry and cursory search were justified as an officer safety precaution. He was therefore lawfully present in (or at the threshold of) defendant's room when he saw the disputed evidence in plain view. The police did not exploit information obtained during an

unlawful search in order to obtain defendant's consent to conduct the follow-up search, and, in any event, that search did not lead to any additional evidence. The court did not err in denying defendant's motion to suppress.

Affirmed.