Argued and submitted February 19, 2010, at De La Salle North Catholic High School, Portland, decision of Court of Appeals reversed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings May 5, 2011

STATE OF OREGON,
*Respondent on Review,*

*v.*

BOBBY LEE GUGGENMOS,
*Petitioner on Review.*

(TC 0500398CR; CA A133266; SC S057378)

253 P3d 1042

Robin A. Jones, Senior Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Douglas F. Zier, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before De Muniz, Chief Justice, and Durham, Balmer, Kistler, Walters, and Linder, Justices.**

---

** Gillette, J., retired December 31, 2010, and did not participate in the decision of this case. Landau, J., did not participate in the consideration or decision of this case.

DURHAM, J.

Kistler, J., dissented and filed an opinion, in which Linder, J., joined.

## DURHAM, J.

Defendant seeks review of a decision of the Court of Appeals that affirmed his conviction for possession of a controlled substance. Defendant contends that the trial court erred in denying his motion to suppress drug-related evidence seized by a police officer from defendant's bedroom following what the state describes as a "protective sweep" of the home in which defendant resided. For the reasons set out below, we conclude that the trial court should have granted defendant's motion to suppress. Accordingly, we reverse the decision of the Court of Appeals and the judgment of the trial court.

We take the following facts from the trial court's findings and other record evidence, which we view in the light most favorable to the state. The search at issue occurred on February 9, 2005, when Detective Mogle of the Oregon State Police, acting without a warrant, searched defendant's bedroom in a house located on Third Street in Klamath Falls. According to Mogle's testimony at the hearing on the motion to suppress evidence, an unnamed informant, at some time in the past, had pointed out the house on Third Street to Mogle as a place where people were selling drugs. The informant also had stated that persons in the house hid "wanted people" there. In the past, Mogle had used an informant in an attempt to buy drugs at the house, but the record does not indicate whether that effort was successful.

Mogle also believed that the house on Third Street was "associated" with another house on Fifth Street in Klamath Falls. Either Mogle or an informant had seen two men, Monteith and Fonseca, at the Fifth Street house at some unidentified time in the past. According to Mogle, Fonseca "had warrants," *i.e.*, he was the subject of one or more outstanding arrest warrants, but Mogle did not explain the basis of the warrants for Fonseca or why the police had not executed them.

Another police officer, Corporal Deese of the Klamath Falls Police Department, testified at the suppression hearing that he had heard from an unidentified source that the Third Street house was a "drug house." Deese also testified that he had had "previous dealings" with one of the

residents of the Third Street house, Tidwell. At one point in his testimony, Deese described Tidwell as a felon who was involved with guns, but later acknowledged that he had confused Tidwell with another person with a similar name, and stated that Tidwell was not a felon and had no history of involvement with guns. Deese testified that two of Tidwell's associates, Monteith and Coatsworth, were involved in guns and that he had seen their cars parked near Tidwell's car at an unidentified place and time in the past.

Deese also had heard from an unnamed informant that there might be drugs in a certain brown pickup truck. On February 9, 2005, Deese saw the brown pickup truck parked in an alley behind the Third Street house and notified Mogle. Mogle asked Deese to accompany Mogle and another police officer, Morrison, to the Third Street house. Mogle planned to conduct a "knock and talk" contact with any residents to learn, if possible, whether any people with outstanding warrants were present. Mogle had no specific wanted person in mind when he formulated that plan.

The police officers drove to the Third Street house. Mogle and Morrison were dressed in plainclothes, not uniforms, and went to the front door; Deese, in uniform, stood outside the back door. Mogle knocked on the front door. After he identified himself and Morrison and displayed a police badge, he was invited inside to the living room. At that point, Tidwell, an adult woman, and a child were present in the living room with Mogle and Morrison. Mogle told Tidwell that he had information that wanted persons might be present and asked to look for them in the house. Tidwell denied that wanted persons were inside the house, and said that only his girlfriend, her child, and someone named "Sam" were there. Tidwell agreed to allow Mogle to search the residence for wanted persons. Mogle asked Tidwell to accompany him in walking through the house, and Tidwell agreed. Tidwell exhibited a cooperative attitude and a conversational tone of voice.

At that point, an event occurred that is central to the state's argument, discussed below, that Mogle subsequently searched defendant's bedroom on the basis of a reasonable suspicion that he or others present faced an immediate

threat of serious physical injury. As Tidwell and Mogle began walking past a stairway that descended from the kitchen to a back door, Mogle observed two men running or moving quickly down the stairs. Mogle yelled at them to stop.[1] The two men paused briefly and looked at Mogle, but continued down the stairs and out the back door. They encountered Deese beyond the door and stopped. Morrison remained with the woman and child in the living room, and Mogle and Tidwell joined Deese and the others downstairs. Mogle asked the men why they were running but received no answer.

Mogle had the following information about the people that he had encountered in the house. Mogle had heard Tidwell's name in the past but he could not recall any official contact with him and had no information that he was a violent person. Mogle recognized one of the two men stopped outside the back door—defendant—as someone with whom he had had official contact, but he could not recall the nature of the contact or whether it involved guns or violence. Mogle had not had any previous contacts with the other man, who was later identified as "Sam." Mogle told Deese to "run" defendant and Sam, that is, to obtain their identification and determine whether any outstanding warrants existed for them.

Mogle went back inside to "clear" the rooms upstairs in the house to determine whether any other persons might be present. The parties agree that Mogle's action was a "search" within the meaning of Article I, section 9, of the Oregon Constitution. Mogle did not request consent from anyone to search the rooms upstairs or, in particular, the bedroom occupied by defendant, and the state does not contend that Mogle's search of that bedroom was a consent search. Mogle testified that he conducted the search in the interest of officer safety. He pointed out that Tidwell had indicated earlier that only one other person, "Sam," was present in the house, but that, contrary to Tidwell's statement, two men had emerged on the staircase. Mogle was concerned

---

[1] The evidence is in conflict about whether Mogle used the term "police" and commanded the two men to stop or, instead (as Deese testified), simply asked where they were going. The trial court apparently chose to take a middle road, finding only that "Mogle yelled at them to stop."

that Tidwell had not been honest about the number of persons present in the house and that Morrison remained in the living room without additional police support.

During the search of the upstairs rooms, Mogle looked into the bedroom that defendant occupied and saw in plain view on a table a mirror with white powder residue and straws. Mogle recognized the items as drug paraphernalia and returned downstairs.

Deese advised Mogle that an outstanding warrant existed for defendant but that no warrants existed for the other man, Sam. Mogle asked Tidwell for consent to search the house for drugs. Tidwell gave consent for all areas of the house except the bedroom that Mogle had just searched, explaining that that was defendant's bedroom. Mogle advised defendant of his *Miranda* rights, disclosed what he had seen on the bedroom table, and requested consent to search the bedroom. Defendant gave his consent to a second search and made some incriminating statements. Mogle's subsequent search of the bedroom brought to light a plastic bag that had contained methamphetamine. Mogle seized the mirror, straw, and plastic bag.

The state charged defendant with possession of a controlled substance. Before trial, defendant moved to suppress the physical evidence seized from his bedroom and his incriminating statements to Mogle, relying on the search and seizure provisions of the state and federal constitutions.[2] After a hearing, the trial court denied the motion, concluding that Mogle's observation of two men running down the stairs gave rise to a valid officer safety concern and justified a

---

[2] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

search of the house to determine who else might be present. Further, the court determined that Mogle subsequently obtained valid consent from defendant to search his bedroom for drugs. The trial court admitted the disputed evidence at trial, and defendant was convicted.

Defendant appealed. The Court of Appeals concluded that Mogle had "stopped" defendant by ordering him to stop as he descended the stairs. However, the court held that the stop was justified by the totality of the circumstances, including the flight by defendant and "Sam," the informants' reports about harboring wanted persons and past drug activity in the house, and Tidwell's act of misinforming Mogle about the presence of a fourth adult in the house. *State v. Guggenmos*, 225 Or App 641, 645, 202 P3d 892 (2009). The court also concluded that the circumstances justified Mogle's first entry into defendant's bedroom as part of a protective sweep of the house and that, because the protective sweep was valid, Mogle did not "exploit" an illegality in subsequently obtaining defendant's consent to a second search of his bedroom. *Id.* at 648-49.

On review, defendant contends that the police unlawfully seized him by ordering him to stop as he left the house. Defendant makes the point that the police had no reasonable suspicion, supported by specific and articulable facts, that he had committed or was committing any crime, or was a threat to anyone. Defendant argues that the reports of unnamed informants recited by Mogle and Deese were not shown to be credible or reliable through any form of corroboration and, in any event, those reports never mentioned defendant at all.

Defendant argues that, because the police stopped him without adequate cause, the subsequent search of his bedroom constituted an exploitation of the illegal stop. Thus, according to defendant, the trial court should have suppressed the evidence that the search of his bedroom exposed, including his admissions, because those items of evidence are the fruit of the illegal stop.

The state responds that the court need not determine the legality of the stop of defendant, because the basis of the search of defendant's bedroom was officer safety, not the

stop. According to the state, because Mogle developed a concern for officer safety, a search of defendant's bedroom was justified whether or not the initial stop of defendant was valid. Defendant responds that the evidence in the record does not satisfy the applicable standards that this court has imposed for a valid search of the private areas in a residence to protect the safety of police officers or others.

We begin by resolving state law issues before federal law issues. *See State v. Juarez-Godinez*, 326 Or 1, 5, 942 P2d 772 (1997) (stating principle). The police seized the evidence in dispute here as the result of a warrantless search of a bedroom and, consequently, "the burden of proving by a preponderance of the evidence the validity of the search is on the prosecution." ORS 133.693(4); *see State v. Tucker*, 330 Or 85, 89, 997 P2d 182 (2000) (applying statutory rule).

The state is correct in contending that we can resolve the validity of the search here without analyzing the separate question of whether Mogle improperly stopped defendant. If Mogle's search of defendant's bedroom violated defendant's rights under Article I, section 9, then the drug evidence that Mogle observed would be subject to suppression. In that event, this court would have no reason to examine whether Mogle had authority to stop defendant, whether the stop caused the subsequent bedroom search, and whether the search constituted an exploitation of the stop. Therefore, we focus our discussion on the validity of Mogle's search of defendant's bedroom.

We have described a person's living quarters as "the quintessential domain protected by the constitutional guarantee against unreasonable searches." *State v. Louis*, 296 Or 57, 60, 672 P2d 708 (1983). Under Article I, section 9, of the Oregon Constitution, a warrantless search of one's private living quarters is *per se* unreasonable and unlawful unless the search fits within a recognized exception to the warrant requirement. *State v. Paulson*, 313 Or 346, 351, 833 P2d 1278 (1992).

Relying on a series of cases decided by this court, the state argues that the search here—a "protective sweep" of the house—was conducted to protect officer safety. Those cases

permit a police officer, during a lawful police-citizen encounter, to take reasonable precautions to protect the safety of the officer or others present if the officer develops a reasonable suspicion, based on specific and articulable facts, that there exists an immediate threat of serious physical injury to the officer or others present. *E.g.*, *State v. Bates*, 304 Or 519, 524-25, 747 P2d 991 (1987) (explaining that the requirement of an immediate threat of serious physical injury must be "based on specific and articulable facts" viewed in light of "the circumstances as they reasonably appeared at the time that the decision was made"). In *State v. Cocke*, 334 Or 1, 9, 45 P3d 109 (2002), this court summarized the teaching of those cases:

> "[T]his court has recognized the reasonableness, for purposes of the Oregon Constitution, of actions by police officers who are in a place where they are entitled to be and are responding to an immediate threat to the officers or to others who might be present. *See, e.g.,* [*State v.*] *Davis*, [295 Or 227,] 242, 666 P2d 802 (1983)] (illustrating point); *State v. Bates*, 304 Or at 519 (officer who has reasonable suspicion that citizen whom officer has encountered poses immediate threat of serious physical injury to officer or others then present may take reasonable steps to protect himself or others)."

*Cocke* declined the state's invitation to recognize a new exception to the warrant requirement for a "protective sweep." However, the court did not rule out use of that tactic by police where the circumstances justify it under this court's standards for an officer safety search.

As in *Cocke*, 334 Or at 7, we again find helpful the discussion of what constitutes a lawful protective sweep that appears in *Maryland v. Buie*, 494 US 325, 110 S Ct 1093, 108 L Ed 2d 276 (1990). *Buie* began by noting that the United States Supreme Court had authorized police to carry out "a limited patdown for weapons where a reasonably prudent officer would be warranted in the belief, based on 'specific and articulable facts,' and not on a mere 'inchoate and unparticularized suspicion or "hunch" that he is dealing with an armed and dangerous individual'[.]" *Id.* at 332 (quoting *Terry v. Ohio*, 392 US 1, 21, 27, 88 S Ct 1868, 20 L Ed 2d 889 (1968)) (citations omitted). *Buie* observed that the Court had applied

the principles of *Terry* in the context of a search for weapons in an automobile during a roadside encounter:

> " '[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.' "

*Id.* (quoting *Michigan v. Long*, 463 US 1032, 1049-50, 103 S Ct 3469, 77 L Ed 2d 1201 (1983)).

Drawing on the principles express in *Terry* and *Long*, the *Buie* Court stated the following in the context of an arrest in a home pursuant to an arrest warrant:

> "We * * * hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. This is no more and no less than was required in *Terry* and *Long*, and as in those cases, we think this balance is the proper one.

> "We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."

*Id.* at 334-35 (footnotes omitted).

We need not decide here whether every feature of the discussion in *Buie* of Fourth Amendment law also reflects principles that this court applies under Article I, section 9. We, however, have applied at least a similar understanding

of the rules that pertain to a protective sweep challenged under the Oregon Constitution. For example, *Cocke* considered the lawfulness, under Article I, section 9, of a protective sweep carried out by police following an arrest of a probationer in a large house that contained several private apartments. The police determined after the arrest that other persons might be present in the house. One officer had heard from another officer that some occupants of the house had firearms. Additionally, the police had visited a neighboring house about one month earlier when a neighbor had complained that someone had pointed a laser sight from a window in the probationer's house, thus suggesting the presence of a firearm. During the sweep of the residence, the police entered the defendant's separate apartment, observed drugs in plain sight, and arrested the defendant.

After confirming that police are permitted to take reasonable steps to protect themselves from an immediate threat of serious physical injury, the court concluded that a "sweep" of the defendant's private apartment was not a reasonable step:

> "[W]e cannot say that such reasonable actions would include entering the private apartment of another individual whose identity, connection to the scene, or even presence is unknown to the officers. * * *
>
> "* * * [T]his case is one in which the officers could articulate only a generalized concern that was based on stale information and that focused neither on defendant nor his apartment. Those circumstances do not justify the police officers' intrusion into the privacy of defendant's apartment."

*Cocke*, 334 Or at 9-10.

Defendant, relying on passages in *Buie* and *Cocke*, contends that a protective sweep was not permissible here, because Mogle was not conducting a sweep incident to the arrest of anyone. We think that defendant reads those cases too narrowly.

*Buie* and *Cocke* referred to searches incident to arrest because the police in each case were conducting a search incident to an arrest. *Bates,* 304 Or at 524, confirmed

that the necessity of taking protective measures can arise "during the course of a lawful encounter with a citizen * * *." *Cocke*, 334 Or at 9, stated that the officer-safety justification applies to the actions of police officers responding to an immediate threat when they are in a place where they are entitled to be. But, as *Bates* and *Cocke* indicated, an officer's lawful encounter with a citizen may give rise to a reasonable suspicion that the citizen poses an immediate threat of serious physical injury to the officer or others regardless of whether the officer is conducting an arrest. That kind of encounter may occur when the police are lawfully present in a private residence or an occupied building, even if they have no intention of arresting anyone. Consequently, we examine the reasonableness of the precautions taken, including the tactic of a protective sweep as discussed above, to determine whether it satisfies the requirements that pertain to any search to safeguard officer safety.

Our cases require a careful examination of the facts to determine whether the circumstances justify the police in carrying out the particular search in question. Two cases illustrate that point. In *Bates*, this court concluded that the circumstances of a late-night traffic stop fell short of creating a reasonable belief that the defendant, who drove the car, posed an immediate threat of serious physical injury to the officer. In *State v. Foster*, 347 Or 1, 217 P3d 168 (2009), this court concluded that the information known by police about the past violent history of the occupants of a house and the presence of weaponry on the premises permitted the police to believe reasonably that the residents constituted an immediate threat of serious physical injury.[3]

---

[3] This court has evaluated police searches conducted to protect officer safety in several other cases, including *State v. Miglavs*, 337 Or 1, 13, 90 P3d 607 (2004) (pat-down search justified by officer safety exception where police knew from personal experience that members of the particular gang of which the defendant was a member carried weapons and that one officer had recently confiscated a gun carried by another member of that gang); *State v. Amaya*, 336 Or 616, 631-33, 89 P3d 1163 (2004) (during traffic stop, passenger's nervous behavior and attempts to conceal a bag, together with early morning hour and high crime area, justified scrutiny of interior of bag to eliminate immediate threat to officer safety); *State v. Ehly*, 317 Or 66, 83, 854 P2d 421 (1993) (officer safety exception applied where defendant, who was a known felon, belligerent, under the influence of methamphetamine, and had recently associated with an individual likely armed with an automatic handgun, rummaged in a gym bag suspiciously with both hands hidden); *State v. Davis*, 295 Or 227, 243, 666 P2d 802 (1983) (warrantless entry to motel room and search of

Our task here is to apply the officer safety exception to the facts of this case. The state relies on several circumstances to justify Mogle's search of defendant's bedroom: (1) the statements by two unnamed informants (discussed below) to Deese and Mogle; (2) information that one of Tidwell's associates, Fonseca, "had warrants," and other associates, Coatsworth and Monteith, were "involved" with guns; (3) the allegation that the Third Street house was "associated" with a house on Fifth Street; (4) the fact that two men were seen running down the stairs, and they disregarded Mogle's command that they stop; (5) the fact that Tidwell had misstated the number of adults present in his house; and (6) the fact that Morrison was alone in the living room with the adult female and her child. We examine those circumstances to determine whether, either viewed separately or as a whole, they constitute specific and articulable facts on which an officer could base a reasonable suspicion that one or more persons in Tidwell's house posed an immediate threat of serious physical injury to an officer or others present.

It is unremarkable that the state seeks to rely in part on tips from informants to the police to carry its burden to prove that Mogle had a reasonable suspicion of an immediate threat in the Third Street house. The state may rely on such tips to establish the probable cause standard to search and to seize private property[4] or the somewhat less demanding standard of reasonable cause to stop a person,[5] and the

---

occupant not justified by need to ensure officer safety where alleged rape victim walked out of room, thus dissipating any exigency).

[4] *See State v. Spicer*, 254 Or 68, 71, 456 P2d 9659 (1969) (In establishing probable cause for a search warrant, affidavit may recite facts reported by a police informant if the affiant corroborates those facts with other "facts within the personal knowledge of the affiant which would lead a reasonably cautious person to believe the informant to be reliable * * *."). Although the legislature later codified reliability requirements that pertain to the use of hearsay in an affidavit to establish probable cause to search, *see* ORS 133.545(4) (affidavit must set forth facts bearing on any unnamed informant's reliability), the statute simply restates the reliability requirements that Article I, section 9, of the Oregon Constitution long has imposed.

[5] *See State v. Lichty*, 313 Or 579, 584, 35 P2d 904 (1992) (information supplied by named informant that she saw "a bag of coke" was sufficiently credible and reliable to justify investigative stop based on reasonable suspicion).

same is true of the reasonable suspicion standard that applies in the officer-safety search context.

As in other contexts, we assess whether the police properly relied on an unnamed informant's tip to form a reasonable suspicion by examining the content of the information supplied by the informant and the degree of its reliability. We examine each of those factors separately. The standard of reasonable suspicion permits an invasion of privacy in order to safeguard officer safety on the basis of an informant's report that is different in quantity or content than probable cause might require, but the state nevertheless must show that the information supplied is reliable or that the informant is credible. As in other settings, we determine from the record the reliability of an unnamed informant's statements by evaluating the informant's basis of knowledge of the facts reported and the facts demonstrating that the informant is credible or that the information reported is reliable.

The record does not disclose the basis of knowledge for the unnamed informant who reported to Mogle that drug sales had occurred in the Third Street house and that the occupants had harbored "wanted people" there. Neither does the record contain any information about the credibility of that informant or the reliability of the reported information. As noted, Mogle testified that he "had been by [the house] with an informant to see if we could buy narcotics out of it." However, Mogle did not testify about the results of that effort. He did not relay any observations by himself or by the informant of drug activity or the presence of weapons during that visit.

Finally, Deese testified that he had heard from an unnamed informant that a certain brown pickup truck might contain drugs. Deese and Mogle later observed that truck in the alley behind the Third Street house, although the record does not indicate whether the brown truck was present when the officers subsequently visited that house. The record does not disclose the basis of the informant's information about the truck, and Deese did not report any drug activity or any suspicious people or activities in connection with their observation of the brown truck beyond where it was parked. That

limited information is insufficient to demonstrate that the informant was credible or that the tip about the brown pickup truck was reliable. Even if we assume that the brown truck still was parked behind the Third Street house when Mogle knocked on the door, the lack of information in the record about the informant's credibility or reliability undermines the state's argument that the truck was linked to drug activity or dangerous persons.

In sum, the record does not demonstrate that the reports of the unnamed informants to Mogle and Deese were credible or reliable. *Bates* requires that an officer's suspicion of an immediate threat of serious injury be based on "specific and articulable facts." 304 Or at 524. Those reports of the unnamed informants to Mogle and Deese do not satisfy that standard. Those reports are insufficient to support a reasonable suspicion that any of the occupants of the Third Street house posed an imminent threat of serious physical injury to the officers during Mogle's visit.[6]

The state sought to demonstrate that the Third Street house was "associated" with a house on Fifth Street. Mogle reported that two men, Fonseca and Monteith, had been at the Fifth Street house, and that Fonseca "had warrants." However, Mogle did not report any observation of suspicious or dangerous activities by those men at the Fifth Street house or at any other location. Deese stated that two of Tidwell's associates, Coatsworth and Monteith, were "involved in guns" and that they and their cars had been seen together and with Tidwell. Deese did not indicate his source for that information. He also did not disclose when or where Coatsworth and Monteith had been seen together, whether their involvement in guns was unlawful, or whether anyone had observed them engaged in any unlawful, suspicious, or violent activity. No evidence placed Coatsworth, Monteith, or Fonseca at or near the Third Street house at any time.

---

[6] During a lawful police-citizen encounter, a threat of serious physical injury to an officer may occur so suddenly that the officer has no opportunity to consider the reliability of an informant's information on which the officer has relied in assessing the threat. We will judge the validity of a search conducted by an officer in response to such an exigent circumstance according to the constitution's touchstone, reasonableness, and any other applicable criteria. This case does not present such an extreme exigency.

The state's evidence about Tidwell's alleged association with Fonseca, Coatsworth, and Monteith, and with the Fifth Street house, is too vague to deserve weight in the calculus. No evidence explained whether any of those persons, acting either singly or in concert, had ever been violent to a police officer. No evidence placed those persons in or near the Third Street house at any time. Considering the record as a whole, the state's contention that Tidwell had an unexplained "association" with Fonseca, Coatsworth, and Monteith is not sufficient to create a reasonable suspicion that those men, or any of them, were hiding in Tidwell's house on February 9, 2005, much less that they were about to attack the police.

The state next points to the fact that, while lawfully present in the Third Street house, Mogle observed two men running down the stairs. The two men paused briefly when Mogle told them to stop, but then continued down the stairs and toward a back door. They stopped when Deese met them at the back door; according to Deese, the two men "absolutely complied" with him at that point. The state contends that that incident contributes to a reasonable apprehension of imminent serious injury to the officers.

The context of that incident is important. Mogle reported no sign of drug activity or weapons in the house when he first was admitted with the consent of Tidwell's girlfriend. Tidwell and his girlfriend were cooperative and spoke in a conversational tone of voice.

According to the state, the conduct of the men on the stairs nonetheless was suspicious for two reasons. First, the conduct constituted, or at least resembled, flight from the police. Second, the appearance of the two men demonstrated that Tidwell had understated the number of adults in the house by at least one.

It cannot be gainsaid that, during an encounter with one or more people, the police may take into account any quick movements or furtive gestures by suspects or others nearby in deciding whether, in the totality of the circumstances, an immediate threat of serious physical injury

exists. We view those sorts of actions, and all surrounding circumstances, in a common-sense fashion. But here, the surrounding circumstances are not sufficient to support an inference that the conduct of the men on the stairs created an immediate threat to officer safety.[7]

There can be circumstances when flight from a police officer or other evasive behavior can combine with other suspicious circumstances to provide reasonable suspicion supporting police protective measures. *See Illinois v. Wardlow*, 528 US 119, 124, 120 S Ct 673, 145 L Ed 2d 570 2000) (evasive behavior "a pertinent factor in determining reasonable suspicion" when considered with other suspicious circumstances, such as whether the location was a high crime area). The actions of the men in running down the stairs and disregarding a verbal directive to stop from a person wearing plainclothes—which is all that the trial court seems to have found to have occurred—was a circumstance that understandably justified heightened police attention. The same is true of the facts that it became apparent that one more adult was present in the house than Tidwell had reported.

---

[7] The dissent argues that the circumstances surrounding Mogle's search of defendant's bedroom were at least as compelling as the circumstances surrounding the search of the passenger's purse in *State v. Morgan*, 348 Or 283, 230 P3d 928 (2010). We conclude that *Morgan* is distinguishable. *Morgan* involved a traffic stop. A female passenger unexpectedly got out of the car and acted agitated and nervous in the presence of the officer. She clutched her purse tightly and shook her head when the officer said he would have to inspect its contents if she insisted on keeping the purse with her. In response, and in the officer's immediate presence, she reached into the purse. Fearing a weapon, the officer grabbed the purse, looked inside and saw drug paraphernalia.

In the present case, Mogle faced no agitated person in his immediate presence reaching into a closed container that could have hidden a weapon. He saw no evidence of weapons and the persons in the house spoke in conversational tones. The behavior of the two men on the staircase, as noted, was somewhat unusual, but it was unaccompanied by threats, clenched fists, or any gesture signaling imminent violence. When Mogle decided to search defendant's bedroom, defendant and "Sam" were standing still and cooperating with Deese.

In our view, the dissent declines to view the facts here as distinguishable from those in *Morgan* because the dissent places less emphasis than do we on the requirement in *Bates* that the officer's suspicion of imminent serious physical injury must be based on both specific and articulable facts, not speculation or guesswork. Judged by that standard, Mogle did not have a reasonable suspicion that defendant's bedroom harbored a person who constituted an imminent threat of serious harm to the officers.

Considered alone or together, however, those facts do not indicate that the police were facing an immediate threat of serious physical injury in the circumstances of this case. Several other factual circumstances inform that conclusion. The additional adult—defendant—and his companion, "Sam," complied with Deese's direction to stop at the back door, and otherwise were cooperating with Deese. Their sole intention seemed to be to leave, not to remain and interfere with or threaten the police. Neither the two men nor any other occupant of the house exhibited any weapon or any violent or threatening behavior. The police saw no evidence that the occupants were armed, and the record lacks evidence of reliable information from police informants that other persons were in the house or were armed and dangerous. Finally, Morrison remained in the house, but he had engaged only in small talk with Tidwell's girlfriend and her child in the front room. The record contains no indication that Morrison was facing a threat of serious personal injury from anyone.

Considering the totality of the circumstances, Mogle could have no more than a hunch, not reasonable suspicion, that one or more people were hiding upstairs in defendant's bedroom and were about to inflict serious personal injury on an officer. Our review of the record indicates that the state has not demonstrated that Mogle's suspicion was supported by the kind of specific and articulable facts that our cases require for an officer safety search of defendant's bedroom. If there was something more that might have justified Mogle's actions, the state did not demonstrate it on the record. As this court observed in *Bates*, 304 Or at 527, "[w]e cannot presume the existence of other favorable facts; we must confine our review to the record made." We conclude that Mogle conducted an unlawful search when he entered defendant's bedroom and saw drug paraphernalia in the form of a mirror and a straw. The trial court should have suppressed that evidence.

After he completed the search of defendant's bedroom, Mogle notified defendant of his discovery of the mirror and straw in the bedroom and asked for defendant's consent to conduct another search of the bedroom. Defendant gave

consent and made inculpatory admissions. Mogle, in searching defendant's bedroom a second time, discovered a plastic bag that had contained methamphetamine. Defendant argues that the trial court should have suppressed the incriminating statements that he made and the evidence discovered after Mogle disclosed his observations in defendant's bedroom.

In our view, that question is controlled by *State v. Williamson*, 307 Or 621, 772 P2d 404 (1989). In *Williamson*, police officers conducted what they acknowledged to be an unlawful stop of the defendant's pickup truck. One officer leaned over the truck bed and smelled marijuana from closed boxes in the truck bed. The officer told the defendant that he had smelled marijuana, gave the defendant his *Miranda* warnings, and told the defendant that he could refuse to consent to a search of the truck. The officer then asked the defendant for consent to search the boxes. The officer also said that if the defendant refused to consent, he would detain the vehicle until he could obtain a warrant to search it. The defendant agreed to the search. The officers searched the boxes and found marijuana.

The defendant in *Williamson* weighed the consequences of consenting to a search only after he knew that the police would detain him and his truck until they could obtain a search warrant and search the truck. This court stated that

"[i]n putting the choice to defendant in those terms, the officers * * * were trading on evidence that they had only by virtue of the unlawful roadblock."

307 Or at 626. The court declined to recognize defendant's consent, given under those circumstances, as voluntary, and the court affirmed the Court of Appeals decision requiring suppression of the evidence.

In this case, defendant similarly knew that he was not free to leave and that the police inevitably would seize the drug-related evidence that Mogle already had seen in plain view in defendant's bedroom. Mogle traded on evidence that he had observed in his unlawful search of the bedroom by disclosing what he had seen and asking for consent to reenter and search the bedroom. As was true in *Williamson*, the

resulting consent was not voluntary. Consequently, the evidence obtained through Mogle's conduct, including the defendant's statements and the plastic bag found in defendant's room, also must be suppressed.[8]

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**KISTLER, J.,** dissenting.

I agree with the majority that police officers may take reasonable steps to protect themselves when they reasonably suspect that they are faced with the risk of an immediate threat of serious physical injury. Those steps include the ability to engage in a "protective sweep" of a home to ensure the officers' safety. I disagree with the majority, however, when it holds that Detective Mogle did not reasonably perceive an immediate threat of serious injury to another officer. In my view, he did, and his response to that threat was a reasonable one. Because Mogle lawfully discovered defendant's methamphetamine while taking reasonable steps to protect another officer's safety, I agree with both the trial court and the Court of Appeals that there was no basis for suppressing that evidence. I respectfully dissent.

Officer Deese of the Klamath Falls Police Department received a report from an informant that "drugs were being sold out of [a] residence" at 614 North Third Street in Klamath Falls. The informant also reported that a brown Jeep pickup was either delivering drugs to the house or associated with the delivery of drugs to the house. Deese passed that information on to Mogle of the Oregon State Police and told him that "if [he] saw the pickup [at that address] there'd probably be a good chance to [contact the homeowner]." One evening, Mogle drove by the house and "spotted the brown pickup in [an] alley" beside the house. On driving by the house, Mogle realized that it was the same house that a different informant had recently shown Mogle "as a location

---

[8] In *State v. Rodriguez*, 317 Or 27, 40-41, 854 P2d 399 (1993), this court stated that "the result [in *Williamson*] may also be explained as based on an exploitation analysis." In light of our result here, we have no reason to determine whether an exploitation analysis, as discussed in *Rodriguez*, also requires the same outcome.

that they were selling narcotics out of and [the informant had] said [that] they hide wanted people there." Mogle was also aware that the house on Third Street was "associated with an address on 5th Street where Nicholas Monteith and Vince Fonseca had been," and he knew that there was an outstanding warrant for Fonseca's arrest.

On seeing the brown pickup parked in the alley, Mogle called Deese and suggested that they go to the house, knock on the door, and talk with the occupants. A third officer, Detective Morrison, went with them. When they got to the house, they noticed a back door to the house that opened onto the alley.[1] Mogle told Deese "that if anybody would want to, they'd probably run out" that door. Mogle asked Deese if "he'd cover the exit of the back door which is on the side in the alley by the pickup." Deese did so, while Mogle and Morrison went to the front door. They knocked, and a man named Tidwell came to the door. Mogle identified himself and Morrison as police officers and told Tidwell that they had information that "there were wanted people" living at the house. Tidwell replied that "it was just him, his girlfriend and a guy named Sam." There also was a child in the living room. Mogle asked if they could look through the house to see if anyone else was there, and Tidwell replied, "go ahead and look."[2]

Morrison stayed in the living room with the girlfriend and the child while Mogle and Tidwell started walking through the house. They walked through a kitchen, down a hall, and came to a stairway that leads to a lower level. The lower level contains two bedrooms and opens onto the alley, where Deese was waiting. (Defendant's bedroom was on the first floor while Tidwell occupied the two bedrooms on the lower level.) As Mogle got to the stairway, he saw "two men running down the stairs." He "hollered stop police. They stopped for a short time. Looked back and then started running again."[3] Mogle ran down the stairs after the two men,

---

[1] Although Mogle referred to the door as a back door, it appears to have been a side door that opened onto an alley running beside the house.

[2] At that point, Tidwell did not place any restrictions on where Mogle could look in the house.

[3] Mogle testified that he yelled, "[S]top police." When asked whether Mogle had yelled "stop," Deese initially said, "No." Deese then immediately added, "Not that I

who ran out the door to the alley and into Deese. At that point, they stopped.

Mogle caught up with the two men and asked them why they were running, but "[t]hey didn't give [him] an answer." Mogle asked Deese to check whether either man had any outstanding warrants while he "went back upstairs to clear the upstairs because my other officer was up there by himself." Mogle then "cleared" the upstairs by briefly looking into the rooms to see if there were any other unexpected persons there. When asked why he had not taken Tidwell with him, Mogle explained:

"Because I didn't want to have, I was told there was only go[ing to] be one other person there, now all of a sudden I got two other people there and Mr. Tidwell makes three. I didn't want to go back upstairs with Mr. Tidwell after seeing two people already run, because as I testified, he [Tidwell] was associated with Vince Fonseca and Nick Monteith and I knew that at that time Fonseca had warrants so I thought maybe he might be upstairs."

In briefly checking the rooms on the first floor for other persons, Mogle saw, in plain view in what turned out to be defendant's bedroom, a "mirror with white powder residue and a yellow straw on a table next to the bed." Mogle continued to check for other persons. When he had satisfied himself that Morrison was safe, Mogle came back to the alley where Deese, defendant, Tidwell, and the other man (who turned out to be Sam) were. At that point, Mogle learned that the bedroom in which he had found the powder, mirror, and straw was defendant's and that there was an outstanding warrant for defendant but not for Sam. Mogle also learned for the first time that Tidwell may not have had authority to consent to a search of the entire house; that is, although Tidwell initially had told Mogle to "go ahead and look" through the house and had placed no restriction on Mogle's ability to do so, Mogle learned after he had checked defendant's bedroom

recall." When asked again whether Mogle had said stop, Deese explained, "I just don't recall that." The trial court found that, when Mogle saw the "two men run down the stairs[,] Officer Mogle yelled at them to stop." The two officers' testimony differed only in whether Mogle had yelled "stop," not whether Mogle also had identified himself as a police officer. When the trial court credited Mogle, it implicitly credited his testimony that he "hollered stop police."

for wanted persons that Tidwell may have lacked authority to consent to a search of that bedroom.

The issue in this case is narrow. There is no dispute that Mogle searched defendant's bedroom when he entered the room to look for wanted persons. Because Mogle did not have a warrant, the search must come within an exception to the warrant requirement, such as consent or officer safety, to comply with Article I, section 9, of the Oregon Constitution. *See State v. Snow*, 337 Or 219, 223-24, 94 P3d 872 (2004). On that issue, the state does not argue that Tidwell had authority to consent to Mogle's search; that is, the state does not contend that Tidwell's initial, unrestricted consent to look through the house was sufficient to permit Mogle's later search of defendant's bedroom.[4] Rather, the state argues that Mogle's search was valid because it came within the officer safety exception; that is, the state contends that Mogle had a reasonable suspicion, based on specific and articulable facts, that there was a risk of serious physical injury to Morrison. In resolving that issue, the majority and I part company over one aspect of it. We disagree whether the evidence in this case was sufficient to meet that standard.

The question whether Mogle's actions came within the officer safety exception entails three related but separate issues, and it is helpful to distinguish them. The first issue is whether Mogle had a reasonable suspicion to believe that there were other persons in the house. If he did, the second

---

[4] In 1983, this court held that, under the Fourth Amendment, a person must have actual authority to consent to a search of someone else's property. *State v. Carsey*, 295 Or 32, 46, 664 P2d 1085 (1983). This court implied in *Carsey* that actual authority also would be required under Article I, section 9, but it specifically did not decide that question. *See* 295 Or at 34 n 1. Seven years later, the United States Supreme Court rejected this court's Fourth Amendment holding in *Carsey. Illinois v. Rodriguez*, 497 US 177, 186, 110 S Ct 2793, 111 L Ed 2d 148 (1990). The Court held that, under the Fourth Amendment, actual authority is not required to consent to a search of someone else's property; apparent authority is sufficient. *Id.* This court has never returned to the state law question that it did not decide in *Carsey*—whether Article I, section 9, requires actual authority to consent. In this case, the state has not argued that Tidwell had either actual or common authority to consent to the search of defendant's bedroom, nor has it argued that apparent authority is sufficient under Article I, section 9. Accordingly, I assume, as does the majority, that some other exception to the warrant requirement is necessary to justify Mogle's entry into defendant's bedroom.

issue is whether Mogle reasonably suspected that those persons might pose an immediate risk of serious physical injury to Morrison. The final issue is whether the steps that Mogle took to protect Morrison from the risk of injury were reasonable.

In resolving those issues, we consider both the quality and quantity of information that Mogle possessed when he went back into the house to check for wanted persons. *See Alabama v. White*, 496 US 325, 330, 110 S Ct 2412, 110 L Ed 2d 301 (1990) (considering those issues). As other courts have recognized, the quality of information necessary to establish reasonable suspicion is less than that required for probable cause. *Id.*; *cf. State v. Montigue*, 288 Or 359, 363-67, 605 P2d 656 (1980) (establishing a higher evidentiary standard for probable cause determinations). In considering that issue, the courts have distinguished among anonymous tips, information obtained from known but undisclosed informants, and information obtained from disclosed informants. *See* Wayne R. LaFave, 4 *Search and Seizure* § 9.5(h), 570-98, (4th ed 2004). For instance, in the context of determining whether reasonable suspicion exists, the courts have recognized that information obtained from an undisclosed informant may have sufficient indicia of reliability because the informant is subject to criminal charges for supplying false information to an officer. *See Adams v. Williams*, 407 US 143, 146-47, 92 S Ct 1921, 32 L Ed 2d 612 (1972); LaFave, 4 *Search and Seizure* § 9.5(h) at 573-74. Conversely, the courts have found reasonable suspicion based on anonymous tips only when corroborating circumstances provide grounds for determining the reliability and basis of the anonymous tipster's information. *Compare White*, 496 US at 331-32 (anonymous tip that accurately predicted the defendant's future behavior sufficient to support reasonable suspicion), *with Florida v. J. L.*, 529 US 266, 271-72, 120 S Ct 1375, 146 L Ed 2d 254 (2000) (anonymous tip that failed to provide any predictive information and thus left the police without a basis to test the informant's knowledge or credibility insufficient to establish reasonable suspicion).

In this case, Mogle relied on information from two known but undisclosed informants. Because both informants

were subject to criminal penalties for falsely reporting information to the police, ORS 162.375, their reports have some reliability. *See State v. Lichty*, 313 Or 579, 584-85, 835 P2d 904 (1992) (so holding regarding named informant). Additionally, the two reports cross-corroborate each other, and the officers observed a brown Jeep pickup parked by the house, consistently with one informant's report. It may be that the two informants' reports would not be sufficiently reliable, standing alone, to establish a reasonable suspicion that drug sales were being conducted out of the house on Third Street or that wanted persons were hidden inside. However, what Mogle learned once he was inside the house corroborated the informants' reports.

As noted, when Mogle first spoke with Tidwell, Tidwell told him that there were three adults in the house: Tidwell, his girlfriend, and Sam. However, when Mogle saw two men running down the stairs, he realized that there was at least one more person in the house than Tidwell had reported. The information that Mogle learned corroborated the informants' reports in two respects. First, the men's sudden flight and their refusal to stop when Mogle directed them to do so corroborated the informants' reports that people inside the house were involved in criminal activity. Second, Mogle reasonably could infer that the reason that Tidwell had not been truthful about the number of people in the house was because the people in the house were involved in drug sales or because the house was used to hide wanted persons, further corroborating the information that both Mogle and Deese had received from the informants. That corroboration sufficiently validated the informants' reports so that those reports, together with the information that Mogle personally observed once inside the house, should be considered in determining whether Mogle reasonably suspected that another person could be in the house who posed a risk of serious physical injury to Morrison.

That substantive determination entails two issues. The first is whether Mogle reasonably suspected that another person could be at large in the house. The second is whether he reasonably suspected that any person still at large posed a risk of serious physical injury to Morrison. On

the first issue, when Mogle undertook a protective sweep, he knew that Tidwell had "underreported" the number of persons in the house. Specifically, Mogle had already discovered one more person than Tidwell had reported, and he reasonably suspected that there could be other people in the house—persons whom Tidwell had not disclosed either because Tidwell was hiding wanted persons or because those persons were engaged in drug sales or for both those reasons.

On the second issue, Mogle reasonably suspected that any persons still at large in the house posed a risk of serious physical injury to Morrision, who remained in the living room. Tidwell had not told the truth about the number of persons in the house. That fact, coupled with defendant's and Sam's sudden and unexplained flight down the stairs, tended to corroborate the informants' reports that drug sales were occurring in the house and that Tidwell was hiding wanted persons there. Mogle reasonably suspected that any person still at large in the house had pressing reasons to avoid capture and could pose a risk of serious physical injury to Morrison, who at that point stood in the way of the only other exit from the house.

It may be that not every person who sells drugs or is subject to warrants poses a risk of danger to the police. But when the two persons whom Mogle had uncovered in the house had sought to flee despite the detective's commands to stop and when the detective had reason to suspect that other wanted persons could still be hiding in the house, he also had reason to suspect that any person who remained at large in the house posed a risk of danger to the one officer who, at that point, was still inside. The question, after all, is not whether Mogle was certain that any person still at large in the house posed a risk of danger to Morrison or even whether Mogle had probable cause to believe that fact. Rather, the question is whether Mogle had a reasonable suspicion "that [any person still at large in the house] *might* pose an immediate threat of serious physical injury to the officer." *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987) (emphasis added). He did.

To be sure, as the majority notes, when Mogle undertook a protective sweep of the house, he was not aware that

defendant, Sam, or Tidwell possessed any weapons, nor had they made any threats or belligerent gestures toward Deese or himself. Tidwell, however, had lied about the number of people in the house, and defendant and Sam had continued to flee despite Mogle's command to stop. When asked why they had run, they had provided no explanation, and Mogle reasonably suspected that they, and anyone else still at large in the house, were involved in drug sales or were wanted persons. This is not a case, such as a roadside traffic stop, in which the officers have no basis for suspecting that the occupants of the car are engaged in criminal activity and in which we consequently have required some evidence of the presence of a weapon or furtive gestures before upholding a search for officer safety. *See, e.g., State v. Amaya*, 336 Or 616, 632-33, 89 P3d 1163 (2004) (discussing cases). In that regard, in determining whether Mogle reasonably suspected that any person who remained in the house "might pose an immediate threat of serious physical injury," it is helpful to compare this case to our most recent officer safety case, *State v. Morgan*, 348 Or 283, 230 P3d 928 (2010).

In *Morgan*, the defendant was a passenger in a car stopped for a traffic offense. *Id.* at 285. She got out of the car on her own, acted "agitated and nervous," and clutched her purse or tote bag tightly. *Id.* at 286. When the officer told her that he would have to check her purse for weapons if she were going to keep it with her, she began backing away, shaking her head, and reached into the purse. *Id.* At that point, the officer seized the purse and, in doing so, saw drug paraphernalia inside. *Id.* This court held that the officer's actions came within the officer safety exception to Article I, section 9. *Id.* at 290. Specifically, we held that the officer in *Morgan* reasonably suspected that the defendant posed a risk of immediate serious physical harm based on her unexpected exit from the car, her visibly nervous behavior, and the fact that she had reached into her purse. *Id.*

The officer in *Morgan* had no reason to suspect that the defendant in that case was involved in drug sales or hiding from the police, as Mogle did here. For all the officer in *Morgan* knew, the defendant was merely a passenger in a car stopped for a minor traffic offense. If the defendant's actions

in *Morgan* were sufficient to give rise to a reasonable suspicion that she might pose an immediate, serious threat to the officer's physical safety, *a fortiori* so was defendant and Sam's unexplained flight from the officer, when coupled with the fact that Mogle reasonably suspected that defendant, Sam, and anyone else still at large in the house was involved in drug sales or was wanted by the police and hiding from them.

The final question is whether Mogle took reasonable steps to check whether anyone else was present in the house. On that point, the officers did not have to be at Tidwell's house. They did not, for example, have to be there to execute an arrest or search warrant or serve a restraining order on anyone. If all the officers had been safely out of the house when Mogle caught up with defendant, Sam, and Deese in the alley, it might not have been reasonable, at least for officer safety purposes, for Mogle to have reentered the house to ensure that no one else was inside. Morrison, however, remained in the living room with defendant's girlfriend and the child, and Mogle reasonably went back into the house to briefly check through a cursory visual scan that no one else was there. The check was no more extensive than necessary to ensure Morrison's safety.

In my view, Mogle was well within the scope of the officer safety exception when he came upon the methamphetamine in defendant's bedroom and, for that reason, did not violate defendant's Article I, section 9, rights. I would hold, as both the Court of Appeals and the trial court did, that the officer's actions stayed within constitutional limits. I respectfully dissent.

Linder, J., joins in this dissenting opinion.