Argued and submitted September 28, 2015, affirmed February 1, petition for review allowed August 3, 2017 (361 Or 800)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JASON BENJAMIN MADDEN,
*Defendant-Appellant.*

Lane County Circuit Court
201305158; A155807

390 P3d 1087

Lindsey Burrows, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jonathan N. Schildt, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Pamela J. Walsh, Assistant Attorney General.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and Tookey, Judge.*

---------------

* Hadlock, C. J., *vice* Nakamoto, J. pro tempore.

## SERCOMBE, P. J.

Defendant appeals a judgment of conviction for one count of unlawful delivery of methamphetamine, ORS 475.890, one count of felon in possession of a firearm, ORS 166.270, and two counts of possession of methamphetamine, ORS 475.894. Defendant assigns error to the denial of his motion to suppress, contending that the trial court erred in concluding that the seizure of defendant that led to the discovery of evidence was justified by officer safety concerns. On review for errors of law, *State v. Holdorf*, 355 Or 812, 814, 333 P3d 982 (2014), we conclude that the trial court's conclusion was correct, and we affirm.

"In reviewing a denial of a motion to suppress, we are bound by the trial court's findings of historical fact that are supported by evidence in the record." *Id.* To the extent that the trial court did not make findings of fact, and where there are facts that could be decided in more than one way, we presume that the court made factual findings consistent with its ultimate conclusion. *Id.* We state the facts in accordance with those standards.

Around 11:30 a.m., eight Springfield Police Department detectives arrived at a residence to execute a search warrant as part of a methamphetamine delivery investigation. Detective Potter had obtained the warrant based primarily on information provided by an informant who had described the sale and use of drugs on the property and had performed a controlled methamphetamine buy at the house. The informant had characterized the residence as a "flophouse" because "numerous people who use and sell kind of hang out at the residence" and "people are just constantly coming and going from that residence." Springfield police had also received several anonymous tips about drug dealing at the house.

As the officers approached the house, they noticed a car parked in the driveway with two men sitting inside. The car, which had California plates, was parked and was not running, and the passenger's side door was slightly open. Defendant was in the driver's seat of the car, and Lando was in the passenger's seat.

None of the officers recognized defendant, but at least three of them, detectives Potter, Espinoza, and Hargis, recognized Lando, whom they knew to be a methamphetamine user and small-time dealer. Additionally, the officers knew that Lando often carried weapons, specifically nunchuks, brass knuckles, and knives. Lando had been carrying nunchuks during about half of his interactions with Potter, and he claimed to "practice[] constantly" with them and to be an "expert martial artist." According to Espinoza, Lando had demonstrated his ability with nunchuks for him; Espinoza thought that Lando was "pretty skilled" with them.

Defendant and Lando noticed the officers as they walked towards the car. Defendant then reached backwards and pushed a black backpack downward, in between the two back seats of the car. When he reached the car, Potter opened the driver's side door and told defendant to step out of the car and to raise his hands. Hargis did the same with Lando, removing him from the car and ordering him to put his hands up. The officers then handcuffed both men, and performed patdown searches. They discovered nothing on defendant's person, but they found methamphetamine in one of Lando's pockets.

The officers testified that they took those actions because they were concerned for their safety. According to the officers, going into a known drug house is a hazardous situation and people inside might be armed or behave irrationally. They needed to act quickly to maintain the element of surprise and secure the house. They did not want to leave the men unsecured because they did not know whether there were weapons in the car, and they believed that defendant and Lando could have posed a threat to them as they entered the house to conduct the warranted search. Additionally, they did not want to leave any officers behind to guard the men and diminish their strength while entering the residence. Potter also testified that he had reasonable suspicion that the men were engaged in drug-related criminal activity.

The officers entered the house about two minutes later and brought defendant and Lando with them. Potter

had defendant and Lando sit with the occupants of the house. He read the group *Miranda* warnings and the text of the search warrant, and he provided a copy of the search warrant for the members of the group to read. While the rest of the officers searched the house, Potter interviewed the members of the group.

Potter interviewed defendant twice. During the first interview, defendant admitted that there was methamphetamine and a gun in the car. During the second interview, defendant consented to a search of the car and signed a document acknowledging that his consent was voluntary.[1]

Espinoza then searched the car, and Potter continued interviewing defendant. Potter asked defendant what was in the car, and defendant said that he had seven and a half ounces of methamphetamine and a gun inside. Defendant also admitted that he was a felon and not legally allowed to possess firearms. During the search, Espinoza opened the backpack and found a loaded handgun, 7.4 ounces of methamphetamine, a digital scale, empty plastic baggies, a methamphetamine pipe, $1,625 in US currency, and $3,600 in Pakistani currency.

The state charged defendant with one count of unlawful delivery of methamphetamine, one count of felon in possession of a firearm, and two counts of unlawful possession of methamphetamine. Defendant moved to suppress the evidence, arguing that it had been obtained as a result of an unlawful seizure of his person.

At the hearing on defendant's motion, detectives Potter, Hargis, and Espinoza, as well as defendant, recounted the events leading to the discovery of the evidence. Following that testimony, the state argued that the police were justified in seizing defendant based on both officer safety concerns and reasonable suspicion that defendant was engaged in drug-related criminal activity. Relying on *State v. Swibies*, 183 Or App 460, 53 P3d 447 (2002), the state contended that the police were justified in detaining defendant for officer safety reasons, because they had reason to believe that

---

[1] On appeal, defendant does not argue that his consent to the search of the car was involuntary.

Lando was armed and dangerous due to his habit of carrying nunchuks, brass knuckles, and knives. Thus, according to the state, they were permitted to detain and handcuff any other people who might have access to those weapons, while executing the search warrant. Alternatively, the state asserted that the facts known to the officers gave rise to reasonable suspicion of criminal activity, including defendant's presence at a known drug house, Lando's involvement with drug use and dealing, the California plates on the car and their knowledge that drugs frequently came to Oregon from California, and defendant's "furtive movements" with the backpack.

Defendant responded that his detention was not justified by either officer safety or reasonable suspicion. He argued that the police knew nothing about defendant that justified his seizure for officer safety reasons; rather, the police thought that *Lando* might be armed. Additionally, he asserted that the officers knew nothing about the residence or its occupants that required the officers to use extra caution when entering the residence and permitted them to seize defendant. Instead, defendant contended that the officers could have simply asked defendant and Lando to leave. Furthermore, according to defendant, even if the officers were justified in ordering defendant to leave the car and in patting him down, once they discovered that he was unarmed, no further officer safety precautions were reasonable under the circumstances. Finally, defendant also argued that the facts known to the officers did not provide reasonable suspicion that defendant and Lando were engaged in criminal activity.

The trial court denied defendant's motion to suppress, concluding that the officers lawfully seized defendant for officer safety reasons. The court explained that, under *Swibies*, "if any one of the persons who are present" when police execute a search warrant "poses a danger and the [c]ourt finds that that would be a known danger to the officers, then all of the persons [present at the place searched] are entitled to be seized * * *." Based on the officers' testimony that Lando habitually carried weapons, the court determined that the officers reasonably believed that Lando might be armed and dangerous, and, therefore, the court

concluded that the police were permitted to seize defendant. The court expressly did not reach the issue of whether the seizure was justified by reasonable suspicion of criminal activity.

Defendant was then tried to the court on stipulated facts and found guilty of all of the charged offenses. The trial court entered a judgment of conviction to that effect, and defendant appealed.

On appeal, the parties largely reiterate the arguments that they raised in the trial court. Because the issue is dispositive, we consider whether defendant's detention by the police was justified on officer safety grounds. The parties agree that defendant was seized when the officers ordered him out of the car. Article I, section 9, of the Oregon Constitution prohibits "unreasonable" seizures.[2] A seizure is not unreasonable if it is "justified by a reasonable suspicion of that person's criminal activity or another exception to the warrant requirement." *State v. Chambers*, 226 Or App 363, 371, 203 P3d 337 (2009). Officer safety is one such exception.

To determine whether officer safety concerns justify constitutionally significant actions by law enforcement officers, we apply the test set out by the Supreme Court in *State v. Bates*, 304 Or 519, 747 P2d 991 (1987). There, the court held:

> "Article I, section 9, of the Oregon Constitution does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

*Id.* at 524.

In applying *Bates*, we are mindful that it is "not our function to uncharitably second-guess an officer's judgment" because "[a] police officer in the field frequently must make life-or-death decisions in a matter of seconds." *Bates*, 304 Or

---

[2] Article I, section 9, provides, in part, " No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

at 524. Accordingly, officers are "allowed considerable latitude to take safety precautions in such situations[,]" and "[o]ur inquiry therefore is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made." *Id.* at 524-25.

In *Swibies*, we considered the extent to which officer safety concerns permit police officers to seize individuals present during the execution of a search warrant. 183 Or App at 466. There, the police executed a search warrant for a house for evidence of narcotics trafficking. They were aware that the property had security cameras, which increased the danger in entering the house because they "eliminate[d] the element of surprise that favors the police when they execute a search warrant." *Id.* at 462. However, the defendant was not present when the police entered the house. Instead, he arrived after the police had secured the premises, approaching a glass door, and looking inside at the police. An officer saw the defendant, opened the door, and "'escorted' him inside the house." The officer then performed a patdown search, which led to the discovery of cocaine on the defendant's person. *Id.* at 464. The trial court concluded that pulling the defendant into the house was justified on officer safety grounds. *Id.* at 464-65.

On appeal, we explained that, during the execution of a search warrant, the "degree of specificity" with which officers must describe a safety concern varies depending on the circumstances:

"When * * * officers enter a residence to execute a search warrant and have reason to believe that some of the occupants may be armed and dangerous, officer safety concerns permit them to handcuff persons who are present but not named in the warrant and detain them long enough to ensure both the officers' and the occupants' safety. [*State v.*] *Barnett*, 132 Or App [520, 524, 888 P2d 1064, *rev den*, 321 Or 137 (1995)]. That is true even though the officers may not be able to identify anything about the persons other than their presence in such a place. *Id.* Conversely, when the officers do not have reason to believe that the occupants are armed and dangerous, something more specific must be shown before officers may handcuff persons whom they find

in the house when they enter. *[State v.] Reinhardt,* 140 Or App [557, 564-65, 916 P2d 313 (1996), *rev dismissed,* 327 Or 521 (1998)]."

*Id.* at 467-68 (footnotes omitted).

We also explained that "[t]he act of entering a home (or other building) to execute a warrant presents unique risks for officers[.]" *Id.* at 468. When police first enter they must "act quickly to ensure that persons who are present do not pose a threat to them." *Id.* However, although officers "still have legitimate concerns for their safety while they continue to execute the warrant," once the premises are secure, "the risks associated with initially entering the house no longer exist," and officer safety concerns will "ordinarily diminish." *Id.*

Applying those principles, we concluded that the defendant's seizure was not justified under the officer safety exception. In holding that the evidence should have been suppressed, we first concluded that the defendant's seizure could not be justified based on a danger that occupants of or visitors to the house might be armed and dangerous. Although there was some indication that the owner of the house might be dangerous (based on his placement of security cameras on the outside of his house), by the time the defendant arrived, the police had secured the premises, and the risks posed by entering the house to execute a search warrant had "diminish[ed]." *Id.* at 468-69. Moreover, the police had no reason to believe that the people who came to the house to purchase drugs were likely to be armed and dangerous. *Id.* at 469. We also determined that there was nothing "specifically about defendant" to justify the search, because the state did not identify any facts to suggest that he might pose a threat to officer safety. *Id.* Accordingly, the officer "could have turned [the] defendant away instead of pulling him in if he had some unspecified and unarticulable concern that [the] defendant might be dangerous." *Id.* at 470.

Turning to this case, the state argues, and we agree, that—in contrast to *Swibies*—the officers were justified in handcuffing and detaining defendant while they executed the search warrant. The officers reasonably believed

that there was at least one weapon in the car, which either defendant or Lando could have accessed. Potter, Espinoza, and Hargis testified that Lando often carried weapons. Moreover, the likelihood that he was armed at that time was high; Potter testified that Lando had been armed in about half of their past encounters. Additionally, the officers' suspicions were heightened when defendant "shove[d]" a backpack, which might have contained weapons, in between the two back seats of the car as the officers approached. Thus, because the officers had reason to believe that Lando had a weapon or weapons in the car, they were permitted to handcuff and detain defendant. *Swibies*, 183 Or App at 467-68; *see also State v. Hawkins*, 225 Or App 355, 363, 201 P3d 239 (2009) ("When officers execute a search warrant and have reason to believe that at least some of the persons present are armed and dangerous, officer safety concerns permit officers to handcuff and detain all persons who are present, even persons not named in the warrant.").

For his part, defendant contends that the police were not justified in seizing him on that basis because the rule described in *Swibies* is limited to "occupants" of a residence that the police are going to search, and he and Lando were not "occupants." Rather, they were in a car outside of the house. According to defendant, for that reason, like the defendant in *Swibies*, the police could have simply sent them away from the house instead of detaining them and pulling them inside.

For purposes of our analysis in this case, however, there is no meaningful distinction between an "occupant" of a residence at the beginning of a search and a person immediately outside the residence at that time. Unlike the defendant in *Swibies*, defendant and Lando did not arrive after the police had already secured the premises and the danger associated with the entering the house had diminished. Rather, they were immediately outside the residence when the police first arrived. At that time, the officers faced a hazardous situation because they were entering a known drug house. The officers had to act quickly to maintain the element of surprise so that they could secure the premises and safely complete the search. *See Swibies*, 183 Or App at 468 ("When the officers first enter [a place to be searched],

they often need to act quickly to ensure that the persons who are present do not pose a threat to them. Once the officers are inside and the premises secure, however, the risks associated with initially entering the house no longer exist.").

Thus, when the police arrived at the residence, the danger of a putative weapon in a car parked immediately outside the residence was similar to that of a putative weapon inside the residence. If the officers had merely asked defendant and Lando to leave, they would have remained in the car, with access to any available weapons, as the officers entered the house. That, in turn, would have created a risk that one of the men could have armed himself and followed the officers into the house, thereby preventing the officers from quickly securing the premises and jeopardizing the safety of the officers and anyone else present in the house. Consequently, in light of their need to act quickly to enter and secure the residence, the officers were justified in seizing defendant to make certain that the people in the immediate vicinity of the house, as well as those inside, were not a threat to their safety. *Cf. Bailey v. United States*, 568 US 186, 193-95, 133 S Ct 1031, 1038, 185 L Ed 2d 19 (2013) (explaining that, under the Fourth and Fourteenth Amendments to the federal constitution, police officers may detain people "found within or *immediately outside* a residence at the moment * * * police officers execute[] the search warrant" (emphasis added)).

Defendant also argues that it was unreasonable under the circumstances for the officers to continue his detention after the patdown revealed that he did not have a weapon on his person. As discussed above, the officers' reasonable belief that Lando was armed and dangerous allowed them to handcuff and detain defendant for "long enough to ensure both the officers' and the occupants' safety." *Swibies*, 183 Or App at 467; *see also State v. Hitchcock/Winters*, 224 Or App 77, 85, 197 P3d 33 (2008) (explaining that a detention incident to the execution of a warrant is justified "for the period necessary to allay concerns about the safety of the police officers and the occupants of the house"). If the officers had released defendant after finding no weapons on his person, defendant would have once again had access to any weapons that were in the car, reviving the safety issue

that the officers had attempted to address by detaining him.[3] Therefore, the patdown did not allay the safety concerns in this case, and, as the circumstances reasonably appeared to the officers, continuing defendant's detention after the patdown was reasonable. *See Bates*, 304 Or at 525 ("Our inquiry [in reviewing officer safety measures] * * * is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made.").

In sum, the officers lawfully detained defendant for officer safety reasons while they executed the search warrant. Therefore, the trial court properly denied defendant's motion to suppress.

Affirmed.

---

[3] Defendant does not challenge the validity of the patdown itself, which, as noted, did not disclose any incriminating evidence.