NELSON, J.
**705 This case concerns the scope of a police officer's authority, under Article I, section 9, of the Oregon Constitution, to detain and question individuals for investigative or officer safety reasons. As police officers converged on a house to execute a search warrant, they encountered defendant sitting in a car in the driveway. They seized and handcuffed defendant, brought him into the house, kept him there while they proceeded with the search, questioned him after the house was secured, and then obtained his consent to a search of the car where they first had encountered him. The police officers' questioning and search produced evidence that the state sought to use in prosecuting defendant on drug and weapons charges. Defendant moved to suppress the evidence, arguing that it was the product of a warrantless seizure and an interrogation that were conducted without a reasonable suspicion that he had committed any crime, in violation of Article I, section 9, of the Oregon Constitution.[1] The trial court denied the motion, ruling that the conduct of the police was justified under an "officer safety" rationale. The Court of Appeals affirmed the trial court's denial of defendant's motion to suppress, and we granted review.
We conclude that the initial seizure and transportation of defendant into the house were justified for officer safety reasons, but that steps that the police took thereafter (continuing defendant's detention after the house was secured, moving him to a separate room, and questioning him) cannot reasonably be ascribed to the officers' safety concerns. Because the evidence at issue was the product of that later conduct, defendant's motion to suppress should have been granted, unless the officers had an independent constitutional justification for continuing the detention. We therefore reverse the contrary decisions by the trial court and Court of Appeals, and remand to the trial court to determine whether the police conduct was justified under an alternative rationale-a reasonable suspicion on the part of the police that defendant had committed a crime.
**706 The following summary of the facts, which are taken from the record, reflects the applicable standard of review. That standard requires us to accept as true all findings of fact that the trial court expressly made, along with those findings that may be presumed from the trial court's ultimate conclusion, as long as those findings are supported by evidence in the record. State v. Stevens , 311 Or. 119, 126-27, 806 P.2d 92 (1991).
*159 In January 2013, detectives with the Springfield Police Department obtained a warrant to search the residence of Sheehan, a "known user and dealer of methamphetamine," for evidence of delivery of controlled substances. The search warrant authorized the police to search Sheehan's person and residence. It did not refer to any other person or location.
Late in the morning of January 30, 2013, the detectives and other members of the Springfield Police Department-eight in total-parked their cars down the street from Sheehan's house and proceeded to the house on foot, intending to execute the warrant. As they approached the house, they saw two men-defendant and Lando-sitting in a car parked in the driveway. Three of the officers-Detectives Potter, Hargis, and Espinosa-immediately recognized Lando, who was sitting in the front passenger's seat with the door slightly ajar, as a person whom they had arrested on multiple occasions for drug crimes. None of the officers recognized the man sitting in the driver's seat, i.e. , defendant.
Detectives Potter and Hargis quickly moved toward the car to "contact" defendant and Lando. Before Potter reached the car, he saw defendant reach back and shove a bag down between the seats. Potter removed defendant from the car, directed him to keep his hands raised, and handcuffed him, while Hargis did the same with Lando. Both men were subjected to pat-down searches, during which Hargis pulled two baggies, one of which appeared to contain methamphetamine, from Lando's pocket. All of this occurred very quickly, and defendant and Lando were taken into the house as the officers entered it to execute the search warrant a few minutes later.
**707 After securing the house, most of the other officers became engaged in the search, while Potter assembled defendant, Lando, and the house's two occupants in the living room. Potter then administered Miranda warnings to them and proceeded to take them, one at a time, into a separate room to question them. Defendant was the first person who was questioned in that manner: Potter had separated him from the others and commenced to question him within five to 10 minutes of entering the house. During that initial questioning, Potter asked defendant about the car and whether it contained anything that was illegal. Defendant responded that the car belonged to a friend, and eventually acknowledged that it contained methamphetamine and a gun. Potter asked if defendant would consent to a search of the car, but defendant seemed reluctant.[2] Potter then told defendant to "think about it" while he questioned Lando and the others. Later, when Potter questioned defendant a second time, defendant agreed to the search and signed a form that stated that he was consenting to the search freely and voluntarily and that he understood that he could refuse to give consent.[3] In the search of the car that followed, the police found a large amount of methamphetamine, a handgun, and other incriminating items inside the bag that Potter had seen defendant push between the seats. Defendant was charged with unlawful possession and delivery of methamphetamine and, based on his status as a felon, unlawful possession of a firearm.
Prior to trial, defendant moved to suppress "any and all evidence resulting from the stop of * * * defendant's person, including the questioning of * * * defendant, the search of * * * defendant, and the search of the vehicle in which * * * defendant had been riding." Defendant asserted that the police lacked reasonable suspicion of criminal activity that would justify the stop under Article I, section 9, of the Oregon Constitution. The state responded that, insofar as officers saw defendant "sitting in a parked car in the driveway of a known drug house, with a known drug dealer, **708 furtively concealing a bag as * * * detectives approached," they did have a reasonable suspicion of criminal activity that would support a stop for further inquiry. The state also argued that defendant had voluntarily consented to the search and that, in *160 any event, the police were justified in detaining defendant for officer safety reasons.
At a hearing on the motion to suppress, Detective Potter briefly described what he and his colleagues knew about the occupants of and activities in the house to be searched at the time the search was conducted. He stated that the department had received anonymous tips from neighbors about drug dealing at the house, and that a police informant had confirmed that methamphetamine was being sold there and had even purchased methamphetamine at the house in a "controlled buy." According to Detective Potter, the informant had described "constant traffic" at the house, with numerous people "hang[ing] out," selling drugs, and generally using the place as a "flophouse."
Detectives Potter, Hargis, and Espinosa testified about their perceptions of and conduct with regard to defendant and Lando. All three reported that they knew, through previous experiences with Lando, that he used methamphetamine and was involved, on a small scale, with selling it. They also testified that they knew that Lando often carried nunchucks and was skilled in their use, and that he sometimes carried brass knuckles and knives. The officers acknowledged, however, that Lando had no history of aggression. None of the detectives had recognized defendant, but Detective Potter testified that he had assumed that both he and Lando were "part of the drug dealers and drug users [who] frequent[ed] the residence [to be searched]."
The three detectives also testified about their reasons for their actions with respect to defendant and Lando. Their testimony was that, in light of their imminent entry into a known drug house where the number of occupants was unknown and where the occupants might carry weapons, behave violently, or be under the influence of drugs, they had reason to be concerned for their own safety in executing the warrant. The officers needed to enter and secure the house quickly to maintain the element of surprise and **709 ensure their own safety. The presence outside the house of two people who appeared to be connected with the illegal activities that reportedly were going on inside, one of whom was known to carry weapons, added to the officers' safety concerns. Detaining and handcuffing defendant and Lando and then bringing them into the house alleviated those safety concerns and it allowed the officers to use all of their power to swiftly and safely secure the house, rather than leaving some officers behind to guard against an attack by defendant and Lando.
Detective Potter also described the actions taken with respect to defendant after the house had been secured. Potter testified that, while other officers proceeded with the search, he had seated defendant, Lando, and the house's two occupants together in the living room, advised them all of their Miranda rights and read them the search warrant. Then, starting with defendant, he had taken each of the detainees to a separate room, one by one, for questioning. He explained that he had chosen to do so because he did not want the detainees to hear each other's answers to his questions-"so they all don't come up with the same story because they're all listening to the conversations." When he questioned defendant, he first asked him about his relationship to the car and then asked whether there was "anything illegal" inside it. Defendant acknowledged that the car contained drugs and a gun and, during a second questioning, consented to a search of the car. During Potter's testimony about these later events, he did not identify any officer safety concern that prompted him to take the actions that he described.
Detective Potter did testify, however, that he immediately had suspected that defendant had been engaged in criminal activity when he first encountered him. He testified that that suspicion was based on (1) his knowledge that defendant's companion, Lando, had a history of using and dealing methamphetamine; (2) his knowledge that the house in whose driveway he had encountered defendant and Lando was being used for dealing drugs; (3) his knowledge, based on his training and experience as a police officer, that drug deals sometimes occurred inside cars; (4) his observation of **710 defendant pushing a backpack down between the seats of the car as he and other police officers approached; (5) his observation that the car that defendant *161 and Lando were sitting in had California plates; and (6) his knowledge, based on his training and experience as a police officer, that "a lot of drugs" were coming into Oregon from Mexico through California.
Defendant also testified at the hearing, and his testimony generally confirmed the sequence of events that the three officers had described. He added, however, that he had not understood why he was being detained and handcuffed at the time, that he had been intimidated by those actions, and that, in consequence, he had felt powerless to refuse when Potter asked him to consent to a search of the car.
After hearing the testimony and arguments, the trial court denied the motion to suppress. The court concluded that the officers "were entitled to look at [defendant and Lando] as if they were on the premises during the initial entry for execution of the search warrant" based on the fact that police had encountered them sitting in a car that was parked in the driveway of the house that was the subject of their search warrant. Additionally, the trial court explained that all the persons on the premises, including defendant, could be lawfully seized and handcuffed for officer safety reasons because one of the persons on the premises-Lando-posed a danger to the officers because he was known to carry weapons.[4] Having decided that removing defendant from the car, handcuffing him, and taking him into the house were lawful under that officer safety theory, the trial court expressly declined to reach the parties' reasonable suspicion arguments.[5] The trial court denied the motion to suppress without expressly addressing whether other aspects of the challenged stop, including holding and **711 questioning defendant after the initial entry into the house, were lawful.[6]
The Court of Appeals affirmed the trial court's decision. State v. Madden , 283 Or. App. 524, 526, 390 P.3d 1087 (2017). Like the trial court, the Court of Appeals relied on the proposition that, in executing a search warrant, police may handcuff and detain all persons who they find at the place to be searched if they have reason to believe that at least some of them might be armed or dangerous. Applying that rule in the present case, the court explained that the officers had reason to believe that Lando was armed, and therefore, for officer safety reasons, could handcuff and detain both him and defendant. Id. at 533, 390 P.3d 1087.[7] As to defendant's argument that that rule has no application to persons who, like defendant and Lando, were not occupants of the residence to be searched, the court concluded that there was no meaningful distinction for officer safety purposes between occupants of a residence that is the subject of a search warrant and *162 persons who are immediately outside the residence at the time the police arrive to execute the warrant. That was so, the court explained, because the dangers associated with entering the residence, which can justify handcuffing and detaining its occupants, also may come from persons who are immediately outside the residence before it has been secured. Id. at 533-34, 390 P.3d 1087. **712 Before this court, defendant observes that, under the court's decisions involving Article I, section 9, a warrantless seizure is justified under the officer-safety doctrine only if the police reasonably believe that the circumstances pose an immediate threat of serious injury and the particular action taken is proportionate to that threat. Defendant's position is that the record here does not support a conclusion that the officers reasonably believed that defendant posed a threat of serious injury, and, even if they did, the measures that they took clearly were disproportionate to the threat. In regard to the latter point, defendant notes that the officers kept him in handcuffs after determining that he had no weapons on his person and continued to detain and question him even after the house had been secured.
The state responds that the evidence in the record does support a reasonable concern for officer safety that justified detaining, patting down, and handcuffing defendant and bringing him into the house. The state contends that the record also supports an officer safety justification for the subsequent actions of the officers-continuing to detain defendant in handcuffs, and interrogating him about the contents of the car-because those actions addressed a concern that, if defendant were released to a vehicle that the police had reason to believe contained a weapon, he might return to the house with the weapon and attack them. But the state's primary argument with respect to the continued detention and interrogation of defendant after the house had been secured is that, at that point, Detective Potter reasonably suspected that defendant had been involved in illegal drug activity, which made it lawful to stop and question him. Although the state thus offers reasonable suspicion of criminal activity as an alternative basis for part of the police conduct that is challenged, we begin our analysis with the "officer safety" doctrine.
This court has long recognized that actions taken by police officers that otherwise might constitute unreasonable searches and seizures for purposes of Article I, section 9, are not unreasonable if they are justified by legitimate officer safety concerns. Applying that rule, the court concluded in State v. Foster , 347 Or. 1, 217 P.3d 168 (2009), that a warrantless entry by police into the curtilage of a house that **713 might otherwise have violated Article I, section 9, was constitutionally permissible because it was a reasonable precaution taken by police based on a reasonable suspicion that the circumstances posed an immediate threat to their safety. Id. at 13, 217 P.3d 168. Similarly, in State v. Amaya , 336 Or. 616, 633, 89 P.3d 1163 (2004), the court applied the rule to hold that, even if a police officer's questioning of a defendant about the contents of her bag constituted a "seizure" of the defendant without reasonable suspicion that she had been involved in criminal activity, the questioning did not violate Article I, section 9, when it was based on a reasonable concern that the bag contained a weapon and that the defendant therefore posed an immediate threat to the officer.
The specific parameters of Oregon's "officer safety" doctrine were first set out in State v. Bates , 304 Or. 519, 524, 747 P.2d 991 (1987) :
" Article I, section 9 * * * does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."
Later cases have explained that the doctrine actually resolves into two "parts" or inquiries. The first inquiry concerns the existence of a reasonable suspicion on the part of the officer that a person with whom they are dealing poses an immediate threat to the officer's or another person's safety. With regard to that inquiry, this court has said that the officer must "be able to point to specific *163 and articulable facts * * * that would reasonably create a fear for the safety of the officer or others." Foster , 347 Or. at 9, 217 P.3d 168. The second inquiry pertains to " 'whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time.' " Id. at 10, 217 P.3d 168 (quoting Bates , 304 Or. at 525, 747 P.2d 991 ). In the context of that inquiry, there is no requirement that the officer's choice of protective measures be justified by "specific and articulable facts." Nor must the state show that the chosen measure was necessary or that other, less invasive measures available to the police would have been sufficient to meet the threat. Id . at 11, 217 P.3d 168. "The officer safety doctrine," as **714 we have explained, "requires only that the choice [of protective measures] actually made be reasonable, even if other choices also would have been reasonable." Id.
The two inquiries are not entirely separate. To the extent that the officer's choice of precautions must be reasonable "under the circumstances as they reasonably appeared at the time," the kind and magnitude of the threat that an officer reasonably perceives will largely determine whether a given precaution taken in response to it was reasonable. While a relatively forgiving "reasonableness" standard applies to the protective measures that may be deemed constitutional under the "officer safety" doctrine, the state must prove that the officer reasonably perceived a threat of serious injury with particularity.
Defendant maintains that the state failed to make a record that could satisfy that particularity requirement. He begins with a proposition that would seem to be indisputable: The mere fact that the officers here encountered defendant while in the process of executing a search warrant is not sufficient, by itself, to support the seizure of defendant's person on an officer safety rationale. We agree with that proposition. Although we are cognizant of the uncertainties that accompany the execution of a residential search warrant, this court never has been inclined to categorically except specified police activities from the protections of Article I, section 9, based on the dangers that supposedly inhere in them. See, e.g. , State v. Jimenez , 357 Or. 417, 426, 353 P.3d 1227 (2015) (rejecting categorical rule authorizing officers to inquire about weapons during traffic stops because of inherent dangers to officers during such stops).[8] We have chosen instead to evaluate each case on its own record to determine whether the police had specific and particularized bases for **715 the safety concerns that they assert to justify their actions, as required by Bates . 304 Or. at 524-25, 747 P.2d 991.
We turn, then, to the record in the present case, and first consider whether the state met its burden to show that the police officers here reasonably perceived a threat from defendant based on "specific and articulable facts." The three detectives who testified at the hearing identified two circumstances that led them to believe that defendant might pose a threat that warranted taking protective measures. First, when they encountered defendant, they were about to execute a search warrant at a house where methamphetamine was bought and sold. Because they knew from their experiences executing other warrants that people in drug houses sometimes have weapons and may attempt to fight, they believed that entering the house to execute the warrant might be especially hazardous. They also had reason to believe that a large number of people might be present at this particular house: Their informant had told them that people were constantly coming and going, and that "tons" of people might be staying there. Under those circumstances, two of the detectives testified, it was particularly important, for officer safety *164 reasons, to enter the house "as quickly and covertly as possible."
Second, they testified, there was reason to believe that there might be a weapon or weapons in the car that defendant and Lando occupied, which might be used by one or both of the men to attack them from behind as they executed the warrant. In support of that belief, the detectives offered their own observations at the scene and their past experiences with one of the car's occupants. Although they knew nothing about defendant himself, they believed, apparently based on defendant's and Lando's presence in the driveway of the residence, Lando's known involvement with methamphetamine, and defendant's gesture of pushing a bag down between the car seats as the officers approached,[9] **716 that both men were "part of the drug dealers and drug users [who] frequent[ed] the residence"-in other words, they were not mere passersby. They also knew that Lando frequently carried weapons-nunchucks, knives, and brass knuckles-either on his person or in a backpack.
The combination of circumstances identified in the officers' testimony as grounds for their safety concerns would support a reasonable concern about officer safety. The officers were about to enter a drug house to execute a search warrant. They did not know how many people they would encounter inside. While those nonspecific concerns would likely be insufficient, by themselves, to warrant an intrusion on the liberties of a generic bystander observed in the vicinity of the house, the officers did not view the two men as generic bystanders. Rather, the officers reasonably suspected that the men, one of whom was known to the police as a small-time drug dealer and both of whom were sitting in a parked car in the driveway of the drug house to be searched, had some connection to the house and its activities and might resist or interfere with a law enforcement action against the house in the same way that an occupant of the house might.
Defendant's contention that these facts were insufficient for the officers to form a reasonable concern about officer safety is not persuasive because, in advancing that argument, defendant considers each given fact or circumstance identified in the testimony in isolation. He then purports to show that that particular fact is categorically incapable of supporting a reasonable officer safety concern. For example, defendant denies that the fact that the officers were in the process of entering a known drug house when they encountered defendant could contribute to the officers' safety concerns, based on the fact that, in at least two cases, State v. Cocke , 334 Or. 1, 45 P.3d 109 (2002) and State v. Guggenmos , 350 Or. 243, 253 P.3d 1042 (2011), this court suggested that the inherent danger to police officers in entering or being present in a known drug house was insufficient, by itself, to support a further intrusion on an occupant's rights on officer **717 safety grounds.[10] In the same vein, but based on statements in Guggenmos and State v. Miglavs , 337 Or. 1, 90 P.3d 607 (2004), defendant suggests that a person who is positioned outside of a space that the police intend to enter cannot pose the kind and level of threat that would support a reasonable concern for officer safety.[11] Finally, based on the different *165 outcomes in Bates , on the one hand, and State v. Ehly , 317 Or. 66, 854 P.2d 421 (1993), and State v. Morgan , 348 Or. 283, 230 P.3d 928 (2010), on the other,[12] defendant contends that a person's possession of a bag or even his or her attempt to conceal a bag from the police cannot establish an immediate threat of serious physical injury to the police when there is no indication that the person is trying to access the bag's contents.[13] **718 It is true that certain of our cases contain statements indicating that the threat posed by each of those highlighted circumstances was insufficient to justify officer safety concerns. But in each of those cases, we considered the fact in the context of all the circumstances that the police were facing at the time, and our dismissal of the particular fact as insufficiently threatening in that particular set of circumstances does not mean that it is equally insufficient in another. Our cases indicate that the question of whether the police reasonably could suspect that the person with whom they are interacting posed a threat of serious physical harm must be resolved by considering the totality of the circumstances. See, e.g. , Amaya , 336 Or. at 633, 89 P.3d 1163 (determining, based on the "totality of the circumstances," that the police officer who questioned the defendant about the contents of her bag had reasonable suspicion that the defendant posed an immediate threat, accepting arguendo that there was a seizure); Bates , 304 Or. at 526, 747 P.2d 991 (considering circumstances identified by state as basis for reasonable suspicion that the defendant posed an immediate threat both "individually" and "collectively").
Defendant also argues that the officers had no legitimate reason to be concerned about defendant and Lando, given the evidence in the record of their superior numbers and their possession of firearms and bulletproof vests. But, while those circumstances might be expected to reduce police concerns about being entirely overwhelmed by defendant and Lando, they would not negate a concern that the officers articulated in their testimony-that a member of their team might be seriously injured in an armed attack by the two men from behind. Neither would those circumstances prevent defendant and Lando from interfering with the officers' plan to approach the house covertly to maintain the element of surprise-which the officers had indicated would help keep them safe as they entered the house. Ultimately, we conclude that the "specific and articulable" facts that the detectives identified in their testimony support a reasonable suspicion that defendant and Lando, both together and individually, "might pose an immediate threat of serious physical injury" to the police officers.
**719 Having determined that the officer safety concerns that the state has identified were reasonable and are supported with specific and articulable facts in the record, we turn to the second part of the analysis described in Bates : Whether the actions taken by the officers, purportedly as safety precautions, *166 were reasonable under the circumstances as they appeared to the officers at the time. 304 Or. at 524-25, 747 P.2d 991. But before we proceed with the task of applying that standard to the police actions that are challenged, we briefly return to an earlier point-that this part of the analysis is relatively deferential to the police. In Bates , we explained the reason for that deference:
"[I]t is not our function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations."
Id. at 524, 747 P.2d 991. Accordingly, we announced, the inquiry about the chosen methods is limited to "whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made." Id. at 525, 747 P.2d 991.
In Foster , the court expanded on the theme of allowing considerable latitude to the police in choosing how to protect themselves. We held that the police need not show that the circumstances "required" them to take a particular protective measure, nor did they need to justify their choice of one reasonable safety precaution over another. Foster , 347 Or. at 11, 217 P.3d 168. Requiring police to make such a showing, we explained, would involve the same sort of "uncharitable second-guessing" that Bates had condemned. Id.
But, while this court thus has asserted that "reasonableness" in this context involves some deference to the choices made by the police, it also has insisted that "reasonableness" incorporates the idea that protective measures must be proportionate to the perceived threat. State v. Rudder , 347 Or. 14, 23-24, 217 P.3d 1064 (2009). Thus, it is against two principles-that officer safety measures must **720 be proportionate and that police officers must have latitude in deciding how to protect themselves-that the reasonableness of the police actions at issue in this case must be measured.
The actions at issue here, which defendant describes as a "series of escalating intrusions," included approaching the vehicle that defendant and Lando occupied from both sides, directing defendant to exit the vehicle, patting him down, handcuffing him, bringing him inside the residence, seating him in the living room with Lando and the occupants of the house (who also had been handcuffed), Mirandizing all of them, transporting defendant alone into different room, and questioning him.[14]
Defendant first argues that the entire series of steps taken by the officers was unreasonable, because any immediate threat posed by defendant's presence could have been dispelled by a simple order to leave. If the officers were concerned that he might not comply with the order, defendant argues, they could have waited for him to respond and then adjusted their actions accordingly. But that argument ignores an aspect of the safety concerns that the officers identified in their testimony. To ensure their own safety, the officers needed to enter and secure the house quickly and covertly. Waiting to see if defendant complied with an order to leave would have prevented them from doing so, and would have added to the perceived threat to their safety.
Defendant also argues that, because the safety concerns identified in the officers' testimony seemed to focus on the possibility that the backpack in the car contained a weapon, the police should have limited themselves to protective measures that were directed *167 solely at that threat, such as seizing the backpack or asking whether it contained a **721 weapon. Because that argument relies on a premise that is demonstrably false-that the officer's safety concerns were limited to the backpack and its contents-we do not give it further consideration.
Defendant next argues that the officer's concern that he might have a weapon would have been alleviated by the "normally * * * sufficient" procedure of patting him down. Even if there was some officer safety reason for handcuffing him during that procedure, he argues, there was no reason for continuing to hold him in handcuffs after the officers completed the pat down and determined that he had no weapons on his person-particularly when Lando, whom the officers seemed to view as the greater threat, remained in handcuffs after being arrested for possessing methamphetamine.[15] Defendant thus argues that none of the police actions after the pat down, including keeping him in handcuffs and transporting him to the house, were reasonable safety precautions under the circumstances. But the state responds, and we agree, that it was reasonable for the officers to leave defendant and Lando in handcuffs and bring them along as the officers entered the house to execute the warrant: Doing so helped the officers maintain the element of surprise that was important to their safety while entering the house and neutralized the risk the officers thought the two men might pose from behind while they focused on the potential dangers in front of them.
What is more, all of those arguments play on the same theme-that, insofar as less intrusive alternative measures might have been sufficient to resolve the officers' safety concerns, the officers were required to take those alternative measures instead. But that line of argument is inapposite. As this court has repeatedly observed,
"the state is not required * * * to justify the choice of one reasonable precaution over another. Indeed, such a post hoc weighing of alternatives would be exactly the sort of uncharitable second-guessing that Bates itself condemned: It would require that an option that was chosen quickly **722 and under pressure be the same one that a reviewer later identifies at leisure and after reflection. Courts should not weigh the possible courses of action against each other; the officer safety doctrine requires only that the choice actually made be reasonable, even if other choices also would have been reasonable."
Foster , 347 Or. at 11, 217 P.3d 168. See also Rudder , 347 Or. at 23, 217 P.3d 1064 (state need not show that police used the least intrusive means available to protect themselves or that the circumstances required the particular response that they took).
That brings us to the actions that the officers took with respect to defendant after they entered and secured the house. Defendant contends that, even if all of the police actions up to that point were justified by a reasonable belief that defendant posed a threat of physical harm, there was no reasonable officer-safety justification for continuing to detain him, in handcuffs, Mirandizing him, repeatedly transporting him alone into another room, and repeatedly questioning him, when the house had been secured and the cited concerns about attacks from behind and maintaining the element of surprise were no longer relevant. We agree. To the extent that those actions could not have made the officers any safer from the perceived threat, they were disproportionate and, therefore, unreasonable.
The state suggests that it was reasonable to continue detaining defendant because, if released to his car, he might access a weapon contained therein and return to the house to attack the officers. According to the state, the same potential scenario justified interrogating defendant about the contents of the car, because it would help the police determine whether the car contained a weapon before they released him. But the idea that the officers would be endangered by defendant after they had secured the house is not reflected in the specific concerns that the officers articulated in their testimony. As *168 noted, those officers testified about the safety threat that defendant posed as the officers approached and entered the house to execute the warrant. They spoke of the need to move quickly for safety reasons, to maintain the element of surprise, and of their concern that defendant might attack them with a weapon from behind. No one expressed a concern that defendant might arm himself and break into a **723 house that already had been secured in order to attack the officers inside. And, more importantly, nothing in the record provided a reasonable basis for such a concern: The evidence presented spoke to the danger defendant seemed to present during the narrow window of time when the police officers were approaching and securing the house, not to a generally violent and dangerous disposition. The proportionality of the challenged police actions must be evaluated against the officer safety concerns that were identified and supported by evidence: As against those safety concerns, the actions taken after the house was secured were disproportionate.
At this point, we have concluded that, although some of the police actions that defendant challenged in his motion to suppress were justified under the officer safety doctrine, later actions that ultimately produced the evidence at issue were not justified under that doctrine. Our ordinary course, in those circumstances, would be to reverse and remand to the trial court to consider the alternative justification for the challenged actions that the state had offered but which the trial court expressly declined to consider-that the actions amounted to an investigatory stop and were permissible because, at the relevant time, the officers had a reasonable suspicion that defendant was involved in criminal activity. See State v. Holdorf , 355 Or. 812, 817, 333 P.3d 982 (2014) (explaining that investigatory stop based on reasonable suspicion of criminal activity does not violate Article I, section 9, of the Oregon Constitution ). See also ORS 131.615(1) (officer who reasonably suspects that person has committed a crime may stop the person and make a reasonable inquiry); ORS 131.605(6) (defining "reasonably suspects" to mean "that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts").
But the state suggests that, rather than remanding to the trial court to consider that alternative theory, this court should address the question itself, and determine whether the trial court reached the correct result, albeit for the wrong reason. Notably, however, the state frames the "reasonable suspicion of criminal activity" inquiry in a way that focuses solely on the ultimate act of "questioning" defendant. In other words, the state does not seek to justify **724 all of the police officer's actions at issue as the kind of investigative stop supported by reasonable suspicion of criminal activity that this court has concluded was constitutionally permissible in the past. See, e.g. , State v. Fair , 353 Or. 588, 593, 302 P.3d 417 (2013) (stating that officer's temporary detention and questioning of a person may be justified on reasonable suspicion of criminal activity); State v. Cloman , 254 Or. 1, 7, 456 P.2d 67 (1969) ("brief detention of citizens * * * for purposes of limited inquiry" is not unconstitutional if supported by reasonable suspicion of criminal activity). Rather, it suggests that, once defendant was lawfully handcuffed and detained for officer safety reasons, the officers could then extend that detention to make inquiries based on a reasonable suspicion that defendant had been engaged in criminal activities. The state likens that analysis to the analysis in traffic stop cases in which the officer initially stops a motorist for a traffic violation, but, based on a reasonable suspicion that the motorist has committed a different crime, extends the stop to investigate that crime. See State v. Rodgers/Kirkeby , 347 Or. 610, 627, 227 P.3d 695 (2010) (suggesting that police may use show of authority to extend lawful traffic stop to question motorist about criminal matters unrelated to the traffic stop if they have reasonable suspicion of the motorist's involvement in criminal activity). Defendant argues, however, that the two situations are not at all alike, and that a seizure that is justified under an officer safety rationale logically cannot be extended or expanded on a different rationale, such as a reasonable suspicion of criminal activity. *169 We are not persuaded that a seizure that is justified by an officer safety rationale can never shift and be justified by a reasonable-suspicion-of-criminal-activity rationale. Although seemingly not descriptive of the present case,[16] we can imagine cases where the police have stopped a person who they do not suspect of personally engaging in criminal activity and, for legitimate officer safety reasons, are justified in taking certain actions, but then develop a reasonable **725 suspicion in the course of those actions. Nothing in Article I, section 9, would require the police to forego investigating their suspicion because of the officer safety circumstance in which it arose. Furthermore, there are circumstances in which the police develop a reasonable suspicion of criminal activity at the time of their initial contact with the person, but cannot immediately proceed to investigate that suspicion because officer safety concerns prompt them to take protective measures first. The fact that the police initially seized the person for officer safety reasons should not bar them from continuing to detain him or her for a reasonable time and in a reasonable manner to investigate their suspicions once the officer safety threat dissipates or is neutralized. Even the "investigatory stop" statute, ORS 131.615, appears to acknowledge that possibility. While subsection (1) of that statute authorizes peace officers to stop a person who they suspect of criminal activity to make a reasonable inquiry, subsection (5) provides that "[a] peace officer making [such] a stop may use the degree of force reasonably necessary to make the stop and ensure the safety of the peace officer * * *." In other words, contrary to defendant's position, either officer safety-driven or investigative justifications can support a police officer's actions with respect to a person they reasonably suspect of criminal activity.[17]
Although we thus generally agree with state's position that individual steps in a series of warrantless seizures of a person may be constitutionally justified under different theories-some under an officer safety rationale and some under an investigatory stop rationale-we do not accept the state's invitation to apply that shifting justifications rationale ourselves to the evidence in the record. For one thing, the state only vaguely defines when, in the series of police actions, it believes the reasonable suspicion rationale became relevant: It does not offer a coherent theory that justifies all the challenged actions, seemingly wishing to leave it to this court to sort out the details. Furthermore, the fact-intensive **726 analysis that is required for any determination that a police action is justified as a brief detention to investigate a reasonable suspicion of criminal activity is one that the trial court should make in the first instance. The trial court expressly declined to decide whether the challenged actions were justified under the "investigative stop" theory, but it should decide that issue on remand, given that we have rejected the officer safety theory that it did decide as a complete answer to defendant's challenge. Accordingly, we remand the case to the trial court to reach the reasonable suspicion argument it did not address.
The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Article I, section 9, of the Oregon Constitution provides, in part:
"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."

Defendant did not own the car, but he was using it with the owner's permission.

Defendant remained in handcuffs through some of these events, but had been released from them by the time he signed the consent form.

The trial court relied for that proposition on a Court of Appeals case, State v. Swibies , 183 Or. App. 460, 467, 53 P.3d 447 (2002), which holds that, as a general rule, when officers enter a residence to execute a search warrant and reasonably believe that at least one of the occupants poses a danger, they may handcuff all of the occupants and detain them "long enough to ensure both the officers' and the occupants' safety."

The trial court also concluded that defendant's consent to the search of the vehicle was voluntary.

As noted, defendant moved to suppress "any and all evidence resulting from the stop of defendant's person, including the questioning of * * * defendant, the search of * * * defendant, and the search of the vehicle in which the defendant had been riding." That phrasing seems to convey that the questioning and search of defendant constituted part of the "stop" that defendant was challenging as a violation of Article I, section 9.

The Court of Appeals explained that the officers had reason to believe that Lando had a weapon in the car because he had been armed in many of their past encounters with him. But the court added that the officers' suspicions "were heightened when defendant 'shove[d]' a backpack, which might have contained weapons, in between the two back seats of the car as the officers approached." Madden , 283 Or. App. at 533, 390 P.3d 1087. In fact, the evidence supporting the latter proposition is quite thin. Detective Potter testified at the hearing on the motion to suppress, that he had seen defendant push the backpack down between the seats in a furtive manner, and he later testified that seeing that gesture contributed to his suspicion that defendant was engaged in illegal activity, specifically, drug dealing. Potter never articulated a concern that, by shoving the backpack down and out of sight, defendant was trying to hide a weapon. In his closing argument, however, counsel for the state described Potter's testimony in a way that suggested that he may have had that concern, and the Court of Appeals may have relied on that description.

It is also true that we will not reject an officer safety justification for a particular search or seizure based on a categorical approach to a given factual circumstance. See, e.g. , State v. Cocke , 334 Or. 1, 9-10, 45 P.3d 109 (2002) (expressly declining to hold that, during an arrest at a residence, it is per se unreasonable to search a nearby but separate residence to ensure officer safety); Jimenez , 357 Or. at 428, 353 P.3d 1227 (although Article I, section 9, does not permit a blanket assumption that routine weapons inquiries during traffic stops are justified by dangers that inhere in such stops, neither does it preclude weapons inquiries in traffic stops when officer has reasonable, circumstance-specific concerns about safety).

As noted above, 363 Or. at 711 n. 7, 427 P.3d at 187, in his testimony, the police detective who saw defendant push the bag down between the car seats did not articulate a specific concern that, in doing so, defendant was trying to conceal, or was reaching for, a weapon. Rather, seeing defendant engage in what he viewed as an attempt to conceal the bag supported the detective's belief that defendant was connected to the illegal drug activity going on in the house. The detective's concern about defendant was that, as a person connected to the house's illegal activities, he might attempt to interfere with the raid on the house.

In Cocke , this court commented that generalized concerns about the dangers inherent in entering a drug house, which did not focus on the defendant himself or his private apartment inside the house, would not support an intrusion into that private apartment on officer safety grounds. 334 Or. at 10, 45 P.3d 109. In Guggenmos , the court held that a "protective sweep" of a suspected drug house that the police had entered with the permission of one of the occupants was not justified in the absence of specific and articulable facts supporting a reasonable suspicion that some person or persons in the house posed an immediate threat of serious physical injury. 350 Or. at 255-60, 253 P.3d 1042.

In Guggenmos , this court suggested that two persons who were attempting to leave a house while police officers were there at another person's invitation could not reasonably be considered a threat to the police. 350 Or. at 260, 253 P.3d 1042. In Miglavs , we suggested that the defendant's failure to leave an area where police were conducting an investigation was a legitimate basis for considering him a safety threat. 337 Or. at 14, 90 P.3d 607. Defendant seems to infer from that suggestion that a person who is not inside the area where police are conducting an investigation cannot legitimately be considered a safety threat.

In Bates , this court rejected the state's contention that a police officer was taking a reasonable officer safety precaution when he seized and searched a bag that he noticed on the floorboard of a car he had stopped for excessive emissions when the driver did not comply with his request to show it to him. In Ehly , this court held that a police officer had reasonable officer safety concerns that justified searching the defendant's bag when defendant was rummaging through it with his hands concealed, and the officer had reason to believe that the defendant's companion had a weapon. 317 Or. at 81-83, 854 P.2d 421. In Morgan , 348 Or. at 290, 230 P.3d 928, we held that a police officer was justified under the officer safety doctrine in seizing the defendant's bag during a traffic stop; he was reasonably concerned about his own safety when the defendant began to reach into the bag.

Defendant also proposes, without any citation to our cases, that persons who appear to be cooperative and unthreatening cannot be suspected of posing a threat to police based on their mere association with a person who is known to carry weapons. Officers here, however, articulated a safety concern that was based on more than defendant's mere association with Lando, as discussed above, 363 Or. at 715 n. 13, 427 P.3d at 189.

As noted above, defendant's motion to suppress appeared to challenge the entire series of events as an unlawful "stop." The state does not argue here, and did not argue below, that any step in that series was unrelated to the evidence that defendant sought to suppress-and, indeed, the later events were at least as important as the earlier events in producing the challenged evidence. But, for reasons that are not entirely clear to this court, the trial court and the Court of Appeals declined to address the later actions-keeping defendant in the house in handcuffs after the house was secured, Mirandizing him, taking him into another room, away from Lando and the others, for questioning, and the questioning itself-that seemed to be included in defendant's challenge.

Although none of the officers who testified described a formal arrest of Lando, one testified that, once the officers found methamphetamine on Lando's person, the officers had probable cause to arrest him and effectively did arrest him by handcuffing and detaining him.

As discussed above, Detective Potter testified that he suspected that defendant was involved in possession and distribution of drugs when he first encountered him, based on defendant's presence in the driveway of a known drug house and other facts.

That does not mean, however, that police officers may continue with whatever measures they have lawfully applied for officer safety reasons after the danger that justifies those measures has dissipated, simply because they also have reasonable suspicions of criminal conduct. At that point, they may only use the degree of force that is necessary for the specific purpose of investigating their reasonable suspicions.